**In the Matter of Alan Paul SHERR, etc., et al., Plaintiffs,**

v.

**NORTHPORT–EAST NORTHPORT UNION FREE SCHOOL DISTRICT, et al., Defendants.**

**In the Matter of Louis LEVY, etc., et al.,**

v.

**NORTHPORT–EAST NORTHPORT UNION FREE SCHOOL DISTRICT, et al., Defendants.**

**Nos. CV 87–3116, CV 87–3197.**

United States District Court, E.D. New York.

Oct. 21, 1987.

82

James R. Filenbaum, Spring Valley, N.Y., for plaintiffs.

Ingerman, Smith, Greenberg, Gross & Richmond by Warren Richmond III, Northport, N.Y., for defendants Northport–East Northport Union Free School Dist., Dr. William J. Brosnan, John Scurti and Clifford Bishop.

Robert Abrams, New York State Atty. Gen. by Tarquin Jay Bromley, Asst. Atty. Gen., New York City, for defendants New York State Com'r. of Educ. and New York State Com'r of Health.

WEXLER, District Judge.

## I. INTRODUCTION

The Bill of Rights opens with the powerful admonition, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ...," U.S. CONST. amend. I, and, at least throughout most of the twentieth century, courts throughout the United States have maintained a vigorous watch over possible governmental encroachment upon the fundamental right of individuals to hold fast to the beliefs and practices that stem from their personal and diverse conceptions of the nature of the universe and man's place

in it.[1] The Supreme Court, for instance, has held that a state compulsory school attendance statute cannot be constitutionally applied to fourteen and fifteen year old Amish children where compliance with the state law "would gravely endanger if not destroy the free exercise of" the children's religious beliefs. *Wisconsin v. Yoder*, 406 U.S. 205, 219, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15 (1972), and carved out religiously-based exemptions to generally applicable requirements for the receipt of state unemployment benefits, *Hobbie v. Unemployment Appeals Commission of Florida*, —— U.S. ——, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987); *Thomas v. Review Board of Indiana Employment Security Division*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Other courts have upheld the right of Native Americans to use the hallucinogenic plant peyote in religious rituals, *e.g., State v. Whittington*, 19 Ariz.App. 27, 504 P.2d 950 (1973), *cert. denied*, 417 U.S. 946, 94 S.Ct. 3071, 41 L.Ed.2d 667 (1974); *People v. Woody*, 61 Cal.2d 716, 394 P.2d 813, 40 Cal.Rptr. 69 (1964); *Whitehorn v. State*, 561 P.2d 539 (Okl.Crim.App.1977); *contra State v. Big Sheep*, 75 Mont. 219, 243 P. 1067 (1926); *State v. Soto*, 21 Or.App. 794, 537 P.2d 142 (1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976), and that of individuals to refuse even life-saving treatment on religious grounds, *e.g., In re Osborne*, 294 A.2d 372 (D.C.1972); *In re Estate of Brooks*, 32 Ill.2d 361, 205 N.E.2d 435 (1965).

Even this most essential freedom of religious belief, worship, and practice, however, cannot be absolute in a society continually striving to achieve the proper balance between the liberties of its individual members and the shared needs of the community at large. In *United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), for example, the Supreme Court ruled that Amish employers must contribute to the Social Security system even though payment of Social Security taxes or receipt of benefits would assertedly violate their religious beliefs. In *Bob Jones University v. United States*, 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983), the Court upheld the Internal Revenue Service's denial of tax-exempt status to two schools that, in conformance with the dictates of religious beliefs, maintained racially discriminatory admissions and associational practices.

It has long been settled that one area in which religious freedom must be subordinated to the compelling interests of society involves protection against the spread of disease. In *Jacobson v. Massachusetts*, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905), the Supreme Court upheld the constitutionality of a Massachusetts law requiring compulsory vaccination and city of Cambridge regulations mandating, under authority of the statute, that all inhabitants be inoculated against smallpox. As one state court stated when confronted with a First Amendment challenge to a vaccination program, the freedom to act according to one's "religious beliefs is subject to a reasonable regulation for the benefit of society as a whole. We affirm that the health regulation in question is a reasonable exercise of police power on a subject of paramount and compelling state interest and, therefore, is valid." *Wright v. DeWitt School District No. 1*, 238 Ark. 906, 913, 385 S.W.2d 644, 648 (1965). *See also, e.g., Board of Education v. Maas*, 56 N.J.Super. 245, 152 A.2d 394 (1959), *affirmed*, 31 N.J. 537, 158 A.2d 330, *cert. denied*, 363 U.S. 843, 80 S.Ct. 1613, 4 L.Ed.2d 1727 (1960).

Certain states, including New York, have determined that, constitutional validity aside, the subjecting of individuals to compulsory vaccination without exception fails to pay sufficient heed to the fact that inoculations offend certain individuals' religious beliefs. N.Y.Pub. Health L. § 2164 sets forth a comprehensive scheme under

---

1. The protections of the First Amendment apply not only to actions taken by the federal government, but by those taken by states and local entities and officials as well. *Torcaso v. Wat-* *kins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

which every child in New York State must be immunized against poliomyelitis, mumps, measles, diphtheria, and rubella. A child who has not been administered vaccinations against these diseases is not permitted to attend school unless a licensed physician certifies that such immunization may be detrimental to the child's health. Subsection 9 of § 2164, however, creates a religiously-based exemption from the law, stating:

> This section shall not apply to children whose parent, parents, or guardian[s] are bona fide members of a recognized religious organization whose teachings are contrary to the practices herein required, and no certificate [of immunization] shall be required as a prequisite [sic] to such children being admitted or received into school or attending school.

The consolidated cases now before the Court bring into question the scope of § 2164's religiously-based exclusion from its coverage and the constitutionality of the law and the specific religious exemption it establishes.

## II. PROCEDURAL BACKGROUND OF THE CASES

On September 8, 1987, plaintiffs Alan Paul and Claudia Sherr filed a complaint against defendants Northport–East Northport Union Free School District, Dr. William J. Brosnan, the superintendent of the school district, John Scurti, the principal of the Dickinson Avenue Elementary School (collectively "school district defendants"), and the New York State Commissioner of Education on behalf of themselves and their son Jared Ryan Sherr alleging that defendants had violated the Sherr family's constitutionally protected rights of freedom of religion and equal protection of the law by refusing to allow Jared Sherr to forego the vaccinations § 2164 requires as a condition to entrance into school. The Sherrs assert that the inoculations § 2164 requires are contrary to their sincerely held beliefs and that, although they are not members of

any formal religious group or denomination, they are entitled to benefit of the exemption set forth in § 2164(9). After a hearing on the day the Sherrs filed their complaint, Chief Judge Weinstein granted plaintiff's request for a temporary restraining order allowing Jared to begin school when the school term opened the next day. On September 18, 1987, this Judge, to whom the Sherrs' case had been assigned, held a conference at which counsel for plaintiffs and the school district defendants, as well as Alan Paul Sherr, were present. At this conference, the Court set a September 23, 1987 date for a hearing on plaintiffs' request for a preliminary injunction, directed that a similar case filed by Louis and Valerie Levy on behalf of themselves and their daughter Sandra Jasmine Levy that had originally been assigned to Judge Dearie should be reassigned to this Judge and consolidated with the Sherrs' action,[2] and ordered that the New York State Commissioner of Health be joined as an additional party to the litigation.

At the September 23 hearing, the Court first listened to argument from counsel for plaintiffs, the school district defendants, and the Commissioners of Education and Health (collectively "state defendants") pertaining to the constitutional questions these cases raise and established an expedited schedule for the parties to submit papers addressing issues surrounding the construction and constitutionality of § 1264. The Court then took testimony from Alan Paul Sherr and Louis Levy, and from Irene Taylor, the assistant superintendent for instruction of the Northport–East Northport Union Free School District. At the close of the hearing, the Court granted plaintiffs' motions in the two cases for a preliminary injunction, holding the evidence adduced so far adequately demonstrated irreparable harm, sufficiently serious questions going to the merits of the cases, and a balance of equities favoring plaintiffs.

On September 28, 1987, the Court resumed proceedings on the cases, at which

---

**2.** The Levy action named as defendants the same parties as did the Sherr's case, except that it designated Clifford Bishop, the principal of the Norwood Avenue Elementary School, as a defendant rather than Dickinson Avenue Elementary School principal John Scurti.

time plaintiffs presented Professor Bennett Ramsey, an assistant professor of religion at Hamilton College, as an expert witness. Each of the parties rested after Professor Ramsey concluded his testimony, and the Court indicated that, after it had received the briefs it had requested from the parties, it would render a decision concerning the ultimate merits of the two cases. The Court will now address itself to the various issues surrounding plaintiffs' request for relief from this Court.

## III. ABSTENTION

During oral argument before the Court and again in their papers, the state defendants have taken the position that this Court should not attempt to adjudicate the final merits of plaintiffs' claims but rather should abstain from assuming jurisdiction over the litigation under the principle of abstention that the Supreme Court first espoused in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The doctrine of "*Pullman*-type abstention," as this form of federal court refusal to exercise jurisdiction over cases the court has the power to adjudicate has come to be known, provides that where unsettled questions of state law may, depending on their resolution, make it unnecessary to decide the issues of federal constitutional law the action involves, a federal court should abstain from wielding its jurisdiction over the litigation until a state court has determined the state law questions in dispute. The state defendants contend that since New York state courts have not ruled on whether plaintiffs' specific situations and religious beliefs fall with the coverage of § 2164(9)'s religious exemption, a federal court should abstain from exercising its jurisdiction over plaintiffs' claims.

■ A court, however, should not lightly turn its back on cases properly invoking the court's jurisdiction over purported violations of the guarantees of individual liberties made by the United States Constitution. As Justice Brennan noted in *Colorado River Water Conservation District v.*

*United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976):

Abstention from the exercise of federal jurisdiction is the exception, not the rule. "The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the State court would clearly serve an important countervailing interest." *County of Allegheny v. Frank Marshuda Co.*, 360 U.S. 185, 188–189 [79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163] (1950).

The Supreme Court has emphasized that "[t]he abstention doctrine is not an automatic rule to be applied whenever a federal court is faced with a doubtful issue of state law" but "rather involves a discretionary exercise of a court's equity powers" on a case-by-case basis. *Baggett v. Bullitt*, 377 U.S. 360, 375, 84 S.Ct. 1316, 1344, 12 L.Ed.2d 377 (1964). The Second Circuit, furthermore, has seen invocation of the *Pullman*-type abstention doctrine to be warranted only if three essential conditions have been met, namely, (1) the state statute involved is unclear or the issue of state law uncertain; (2) resolution of the federal issue depends upon the interpretation to be given to the state law; and (3) the state law is susceptible of an interpretation that would avoid or modify the federal constitutional issue. *McRedmond v. Wilson*, 533 F.2d 757, 761 (2d Cir.1976).

■ The Court finds that the circumstances the Sherrs and Levy's actions present are not of the "exceptional" nature that the Supreme Court has indicated to be required for a federal court to abstain from its duty fully to adjudicate cases and controversies properly placed before it and that the first of the three necessary conditions for abstention delineated by the Second Circuit is lacking in the situation now before the Court. If § 2164's religious exemption were to be interpreted so as to except from the statute's immunization re-

quirements the children of individuals whose religious beliefs prohibit vaccinations against disease even if these persons do not belong to a "recognized religious organization," plaintiffs' constitutional challenges to the statute and defendants' application of the law to them might well be mooted. Also, there can be little question that § 2164 can reasonably be interpreted in a manner that would alter the constitutional questions presented or make it unnecessary for the court to reach them: Those state courts that have addressed the scope of § 2164's religious exemption appear uniformly to have found that the exemption cannot be limited to members of recognized religious groups. *E.g., Brown v. City School District of the City of Corning,* 104 Misc.2d 796, 429 N.Y.S.2d 355 (Sup.Ct. Steuben Co. 1980), *affirmed,* 83 A.D.2d 755, 444 N.Y.S.2d 878 (4th Dep't 1981); *Matter of Maria R.,* 81 Misc.2d 286, 366 N.Y.S.2d 309 (Fam.Ct.N.Y.Co.1975); *Maier v. Besser,* 73 Misc.2d 241, 341 N.Y.S.2d 411 (Sup.Ct. Onondaga Co. 1972).

Nonetheless, the fact that state courts in diverse regions of the State of New York have fundamentally been at one in their reading and application of § 2164(9) undercuts any claim that the state statute plaintiffs call into question in this litigation is so unclear or the issue of state law so uncertain that this Court should refrain from even considering the merits of plaintiffs' contentions. The statute, moreover, has been on the books since 1966 and it has remained unchanged in any manner pertinent to plaintiffs' lawsuits since its enactment. The actions at bar, therefore, offer a situation far different from those presented in cases in which courts have deemed abstention warranted because of the unsettled nature of recently enacted state laws that had never been construed by any state courts. *E.g., Lake Carriers' Assn. v. MacMullan,* 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); *Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976); *Catlin v. Ambach,* 820 F.2d 588 (2d Cir.1987). Additionally, abstention is especially inappropriate in circumstances where not only is the state law issue not particularly unsettled but the de-

lay that abstention necessarily entails would be highly prejudicial to plaintiffs' interests in obtaining a judicial determination that they hope will allow them to conduct their affairs in conformance with their purportedly religious beliefs and allow their children to continue their formal education without further obstacles. As the Supreme Court noted in *Baggett,* "abstention operates to require piecemeal adjudication in many courts, thereby delaying ultimate adjudication on the merits for an undue length of time, a result quite costly" where what is at stake is the "exercise of First Amendment freedoms." 377 U.S. at 378–79, 84 S.Ct. at 1326 (citations omitted). *See also, e.g., Procunier v. Martinez,* 416 U.S. 396, 404, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974); *Long Island Vietnam Moratorium Committee v. Cahn,* 437 F.2d 344 (2d Cir.1970), *affirmed,* 418 U.S. 906, 94 S.Ct. 3197, 41 L.Ed.2d 1153 (1974).

*Maier v. Good,* 325 F.Supp. 1268 (N.D.N.Y.1971), which the state defendants cite in their papers, does not require an opposite conclusion. *Maier v. Good,* like the instant actions, involved a constitutional challenge to the denial of a religious exemption to a family who claimed that inoculation was prohibited by the dictates of their religious beliefs but did not actually belong to any formal religous denomination. A three judge court determined that it should abstain from deciding the constitutional issues the Maiers' case presented. The court premised its ruling on two separate grounds. First, the court noted that the statute was a relatively new one and its application to facts similar to those presented by the Maiers' lawsuit had not yet been ruled upon by the New York state courts. Second, the court rejected the plaintiffs' argument that an administrative appeal to the New York Commissioner of Education would be futile and that therefore they need not exhaust the state administrative remedy that N.Y.Educ.L. §§ 310, 311 made available to them. Plaintiffs relied for their position upon the fact that, prior to the enactment of § 2164, the State Department of Education had issued a memorandum opposing the granting of any

exemptions to the statute's mandatory immunization requirements. The Court held that this pre-enactment statement bore little weight upon how the Commissioner of Education would interpret the statute as enacted.

*Maier v. Good* is easily distinguishable from the situation the cases currently before the Court present. Section 2164 is no longer new and the state courts have had ample time to rule upon the scope and constitutionality of § 2164(9)'s religious exemption. In fact, one of the cases in which a state court has construed § 2164 is the Maier family's own action in state court after the federal court declined to hear their case. *Maier v. Besser*, 73 Misc.2d 241, 341 N.Y.S.2d 411. Furthermore, since the federal court *Maier* decision was handed down, the Commissioner of Education has ruled on a number of occasions that an administrative appeal to the Commissioner cannot be used as a means of challenging the constitutionality of a statute, and has declared it to be his formal opinion that in order to secure an exemption to § 2164's vaccination requirements, one must establish membership in a religious organization whose teachings are contrary to immunization rather than simply a personal, religiously mandated opposition to inoculation. *E.g., Matter of Van Druff*, 21 Educ.Dept. Rep. 635 (1982); *Matter of Curtin*, 20 Educ.Dept.Rep. 473 (1981); *Matter of Maier*, 12 Educ.Dept.Rep. 56 (1972).[3]

Accordingly, the Court holds in its discretion that it should not abstain from assuming jurisdiction over the Sherrs and Levys' actions.

## IV. STANDING

The state defendants also contend that, even if the Court declines to abstain from exercising jurisdiction over the Sherrs and Levys' cases, the Court should dismiss plaintiffs' action for lack of standing. Defendants' position essentially boils down to the following: § 2164 provides for mandatory immunization of school children against certain diseases and admits of only two exceptions, *i.e.*, if a licensed physician certifies that vaccination may be detrimental to a given child's health or if a child's parents (or guardian) are "bona fide members of a recognized religious organization" whose doctrines prohibit inoculations. Plaintiffs, who have produced no medical certification that compliance with § 2164's vaccination requirement would be physically harmful to their children and who concede that they are not members of any "recognized religious organization" and thus fall outside the literal language of § 2164(9)'s religious exception, seek that the Court declare their children to be entitled to an exemption from immunization on religious grounds and hold the New York statute's limitation of religiously-based exemptions to "bona fide members of a recognized religious organization" violative of the First Amendment's guarantees of religious liberty and the Fourteenth Amendment's promise to all persons of equal protection of the law. If the Court deems plaintiffs' claims to possess merit, defendants argue, the end result will be that § 2164(9) will necessarily be struck down in its entirety. Accordingly, even if plaintiffs were to obtain a favorable ruling by the Court in the form of a declaration of the invalidity of the statutory exemption, the Sherr and Levy children would still be subject to vaccination under a § 2164 that would lack any religious exception to immunization. Thus, the state defendants conclude, any injury plaintiffs allege cannot be redressed by the remedies that they seek from the Court, and they therefore lack any standing to maintain the lawsuits they have brought before the Court.

■ Defendants' argument misconstrues the nature of the Sherrs and Levys' actions. Plaintiffs do not seek that § 2164(9) be completely invalidated; rather, they question the legitimacy solely of that portion of § 2164(9) which limits religious exemptions to "bona fide members of a recognized religious organization." A judicial decision in plaintiffs' favor would entail an order declaring the limitation contained in

3. *Matter of Maier* is the administrative appeal to the Commissioner that followed the Maier family's action in federal court and preceded their state court action.

the clause of § 2164(9) at issue to be improper and holding plaintiffs to be entitled to a religious exemption from vaccination. N.Y.Pub. Health L. § 5000 states that:

> If any clause, sentence, paragraph, section or part of this chapter shall be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph, section, or part thereof, directly involved in the controversy in which such judgment shall be entered.

*See also McCartney v. Austin,* 31 A.D.2d 370, 298 N.Y.S.2d 26 (3d Dep't 1969).

Under § 5000, only the specific *clause* of § 2164(9) would be void, not the entire subsection. As plaintiffs point out, acceptance of the state defendants' standing argument would mean that persons who feel that the religious exception § 2164 provides is structured and being applied in an unconstitutional and discriminatory manner would be completely barred from attempting to vindicate their rights in a federal, and by logical extension, state court, and thus would lack any judicial forum for their efforts to obtain the benefit of the religiously-based exception from immunization that the New York legislature has decided to grant state citizens.

## V. CONSTITUTIONALITY

Ordinarily, in an effort to avoid needless rulings on questions of constitutional law, a court should dispose of all the other issues a case presents before turning to a litigant's challenge to the constitutionality of a statute or ordinance. *See Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). In the instant litigation, however, this is not possible. The language of § 2164(9) explicitly limits invocation of the religious exemption the statute provides to persons who are members of a "recognized religious organization." Neither the Sherr nor Levy families are members of any recognized religious organization. Therefore, if § 2164(9) is constitutionally valid as written, neither set of plaintiffs is entitled to the religious exemption § 2164 provides regardless of any other factors that may be necessary for plaintiffs otherwise to prevail on their claims. Accordingly, the Court will now turn to plaintiffs' constitutionally grounded challenges to the limited applicability of the religious exemption § 2164(9) contains.

As the Court noted earlier in this opinion, *supra* p. 83, it has been settled law for many years that claims of religious freedom must give way in the face of the compelling interest of society in fighting the spread of contagious diseases through mandatory inoculation programs. In enacting § 2164, the New York State legislature apparently determined that subjecting all individuals to compulsory immunizations without exception does not give due deference to the religiously-based opposition to vaccinations that certain persons maintain and therefore provided for the religious exemption set forth in § 2164(9). The legislature's creation of a statutory exception that goes beyond what the Supreme Court has declared the First Amendment to require undoubtedly reflects a highly praiseworthy urge to minimize imposition of the state's inoculation program upon adherents of religious belief systems whose teachings are at odds with the concept and methods of immunization utilized by the state. Nevertheless, the exception New York has created obviously cannot be such that it itself violates the constitutional rights of certain of the state's citizens.

■ In the period since the Second World War, the Supreme Court has addressed a multitude of challenges brought under the "establishment clause" of the First Amendment dealing with such hotly contested and diverse issues as the reimbursement to parents of the transportation costs of sending their children to parochial schools, *Everson v. Board of Education of Ewing Township,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), prayer in the public schools, *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), property and tax exemptions for religious organizations, *Walz v. Tax Commission of the City*

*of New York,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), and a law prohibiting the teaching of evolution in public schools unless "creation science" is also taught, *Edwards v. Aguillard,* —— U.S. ——, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). No lengthy citation or analysis of case law construing the establishment clause, however, is necessary for one to see that § 2164(9)'s limitation of a religious exemption from vaccination to those who are members of recognized religious organizations is blatantly violative of that First Amendment guarantee.

In *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), the Supreme Court first synthesized the three-pronged test that the Court now consistently utilizes as the standard by which the constitutionality of laws challenged under the establishment clause must be measured.[4] First, the legislature must have had a secular purpose for adopting the enactment in question. Second, the primary effect of the law to be scrutinized must be one that neither advances nor inhibits religion. Third, the statute must not result in an excessive entanglement of government with religion.

The clause of § 2164(9) at issue in this litigation runs afoul of at least two of the three elements of the *Lemon* test. Section 2164 as a whole obviously is designed to achieve the purely secular purpose of protecting New York's school children from the outbreak of communicable diseases. Subsection 9 of § 2164, on the other hand, seems to be designed specifically to advance the interests of individuals who oppose vaccination on theological grounds. Such treatment of religious interests can justifiably be seen as a reasonable accommodation of the considerations more direct-

ly addressed by the free exercise clause of the First Amendment, *see, e.g., Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15; *Sherbert,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965, but, as the Court will discuss momentarily, it is far more questionable whether free exercise values can legitimate the distinctions between different categories of the religious public that § 2164(9)'s limitation of its coverage to "bona fide members of a recognized religious organization" entails. Defendants assert that the legislature may have had a number of secular purposes for adopting § 2164(9)'s limiting language. The restriction, for instance, may have been intended as a guard against claims of exemption on the basis of personal moral scruples or unsupported fear of vaccinations, as a means of allowing certain exemptions without risking lessened effectiveness of the state's inoculation program due to the granting of a large number of exemptions, or perhaps because of the difficulties inherent in devising a legally workable definition of religion. In any event, given the constitutional infirmity of § 2164(9)'s limitation under the other two prongs of the *Lemon* test, the Court need not definitively resolve whether the portion of § 2164 in dispute possesses a secular purpose sufficient to withstand plaintiffs' attack upon it.

The primary effect of § 2164(9)'s limiting clause is manifestly the inhibiting of the religious practices of those individuals who oppose vaccination of their children on religious grounds but are not actually members of a religious organization that the state recognizes. While bona fide members of such religious groups may maintain a mode of life for their children in accordance with their religious precepts, other persons who oppose inoculations on reli-

---

**4.** In *Edwards,* —— U.S. at —— n. 4, 107 S.Ct. at 2577 n. 4, one of the Supreme Court's establishment clause decisions this past term, Justice Brennan stated for the Court:

The Lemon test has been applied in all cases since its adoption in 1971, except in *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), where the Court held that the Nebraska legislature's practice of opening a session with a prayer by a chaplain paid by the State did not violate the Establish-

ment Clause. The Court based its conclusion in that case on the historical acceptance of the practice. Such a historical approach is not useful in determining the proper roles of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted (citation omitted).

State mandated inoculations against disease were similarly not in existence when the First Amendment was drafted.

gious grounds confront the dilemma of having to flout the dictates of their beliefs if they wish to educate their children and conform to the requirements of state law. As the Supreme Court remarked in *Everson,* 330 U.S. at 15, 67 S.Ct. at 511, "The establishment of religion clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, and all religions, or prefer one religion over another."

Also, § 2164(9)'s restriction of the exception to "recognized religious organizations" clearly requires that the government involve itself in religious matters to an inordinate degree. The Supreme Court has frowned upon the government becoming too involved in matters so seemingly mundane as property disputes if they necessitate that the state delve too deeply into questions of religious dogma. *See, e.g., Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979); *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); *Kreshik v. St. Nicholas Cathedral,* 363 U.S. 190, 80 S.Ct. 1037 (1960); *Kedroff v. St. Nicholas Church of Russian Orthodox Church in North America,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952). Here, New York has conditioned the conferring of a statutorily created exemption on membership in a religious denomination upon which the state, if the attempted witticism can be forgiven, has bestowed a blessing of governmental approval. Subsection 9 of § 2164 makes available to members of certain religious organizations to which the state has given some sort of official recognition a statutory benefit for which other individuals who may belong to either an unrecognized religious group or possess their own personal religious beliefs are not eligible. The establishment clause surely cannot mean much if a preferential restriction such as that contained in § 2164(9) can pass constitutional muster.

Section 2164(9)'s restriction of the religious exception to New York's compulsory vaccination requirement for school children also must fall when viewed in light of the commands of the free exercise clause of the First Amendment. The Supreme Court formulated its modern approach to free exercise claims in its 1963 *Sherbert* decision. In holding that South Carolina could not deny unemployment benefits to a Seventh Day Adventist who refused to work on Saturdays because of her religious beliefs, the Court employed what is essentially a four step inquiry in which it must be determined if (1) a religious belief or practice is involved; (2) such a belief or practice is burdened by the governmental action in question, (3) a compelling state interest justifies such an infringement on First Amendment rights; and (4) even if such a compelling state interest is present, is there a less restrictive alternative that might allow the government to achieve its purposes without intruding upon religious liberty.

A claim by an individual of entitlement to a religiously-based exclusion from § 2164's inoculation program even though he is not actually a member of a "recognized religious organization" clearly involves a religious belief or practice, and the ability of such a person to structure his family life in a manner that conforms with the religious dictates to which he subscribes are surely burdened by New York's requirement that his children be vaccinated. Furthermore, while the courts have left no doubt that society's compelling interest in preventing disease must override any personal opposition to immunization that some citizens may possess, defendants have not advanced, nor can the Court on its own conceive of, any compelling societal interest that might justify the burden placed upon the free religious exercise of certain individuals while other persons remain free to avoid subjecting their children to a religiously objectionable medical technique merely because they may belong to a particular religious organization to which the state has given a stamp of approval. While the state may be quite genuinely concerned with limiting improper evasion of immunization, minimizing the total number of people exempt from the mandatory

vaccination program, or devising a legally and logically coherent definition of religion, there surely exist less restrictive alternative means of achieving the state's aims than the blatantly discriminatory restriction of § 2164(9)'s religious exemption that the state has devised. The Supreme Court has declared, "The essence of all that has been said and written on the subject is that only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Yoder*, 406 U.S. at 215, 92 S.Ct. at 1533. Defendants can point to no such interest that might legitimate the limitations that § 2164(9) places upon the religious freedom of individuals who are not members of a "recognized religious organization."

The Court's holding regarding the constitutionality of § 2164(9)'s limitation of the religious exemption it creates is supported by the conclusions of the New York state courts which have been faced with claims of entitlement to religious exemption from immunization similar to those the Sherrs and Levys now make. *Maier v. Besser* ruled § 2164(9)'s exemption to be applicable to a family which held beliefs that parallelled to a great extent the teachings of the Christian Scientist Church but did not actually belong to that religious denomination. The court stated:

> It was obviously not the intent of the Legislature to force individuals to join a religious organization in order to practice their religious tenets freely, but rather to prevent individuals from avoiding this health requirement enacted for the general welfare of society, merely because they oppose such medical procedures on the basis of personal moral scruples or by reason of unsupported personal fears. No doubt the language of [§ 2164(9)] was drafted to safeguard against the claim of exemption by this latter category of persons
>
> .    .    .    .    .    .
>
> Clearly, the child of a parent who is a bona fide Christian Scientist may be enrolled and received into school under the statutory exemption. To deny the exemption to a child whose parent conscientiously and honestly believes and practices the teachings and tenets of the Christian Science faith, notwithstanding lack of formal membership in the Church, would require a holding that the exemption provision of the statute is unconstitutional.

341 N.Y.S.2d at 413 (citations omitted). The *Maria R.* court dismissed a child neglect petition against parents who failed to have their child vaccinated because of their religious beliefs, holdling that "[f]ormal church membership is not a requirement as long as the family honestly believes and practices the tenets of a religious group." 366 N.Y.S.2d at 311. *Brown* granted a litigant's application for a preliminary injunction allowing his daughter to attend school even though the plaintiff did not demonstrate any membership in a recognized religious organization. Additionally, the only relevant federal court decision of which this Court is aware also held the scope of § 2164(9)'s religious exemption to be wider than that which the actual language of the statute seems to establish. In *Allanson v. Clinton Central School District*, No. CV 84–174, slip op. at 5, (N.D. N.Y. May 10, 1984), then-District Judge Roger Miner, citing *Brown*, adopted a construction of the provision that eliminated the requirement of membership in a religious organization.

Accordingly, the Court holds that § 2164(9)'s restriction of a religious exemption from immunization to children whose parents or guardians are "bona fide members of a recognized religious organization" whose doctrines oppose such vaccinations is violative of both the establishment and free exercise clauses of the First Amendment to the United States Constitution. Plaintiffs in the litigation at bar, therefore, may properly claim entitlement to the statutory exception from inoculation of their children so long as they meet the other elements necessary to qualify for

such an exemption. It is to these other requisites that the Court will now turn.[5]

## VI. "RELIGIOUS" NATURE OF PLAINTIFFS' BELIEFS

Section 2164(9) provides a religiously-based exception to New York's program of compulsory vaccination of school children. This exception, obviously, must be restricted to persons whose opposition to immunization stems from *religious* beliefs, not views founded upon, for instance, medical or purely moral considerations. The next step in determining whether the Sherrs or Levys should prevail in their respective actions, therefore, is for the Court to undertake an inquiry into whether the grounds which these plaintiffs have put forth as the bases for their opposition to the inoculation of their children are indeed "religious" in nature.

Defining "religion" for legal purposes is an inherently tricky proposition. For one, the very attempt brings the government exceedingly close to the involvement with ecclesiastical matters against which the First Amendment carefully guards. Additionally, the tremendous diversity of the manners in which human beings may perceive of the universe and their place in it may make the task virtually impossible. Scholars have been deeply perplexed by the problems engendered by the necessity of delineating what constitutes the "religion" which the First Amendment protects, *see, e.g.*, Choper, *Defining "Religion" in the First Amendment*, 1982 U.Ill.L.Rev. 579; Note, *Toward a Constitutional Definition of Religion*, 91 Harv.L.Rev. 1056 (1978), and courts have struggled to formulate workable definitions. The Supreme Court, for example, has held that a religion need not necessarily be founded upon a belief in the fundamental premise of a "God" as commonly understood in Western theology, *Torcaso v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961), and has written that "the test of belief 'in a relation to a Supreme Being' is whether a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God." *United States v. Seeger*, 380 U.S. 163, 165–66, 85 S.Ct. 850, 854, 13 L.Ed.2d 733 (1965). The Supreme Court and Second Circuit have each declared religion to involve the "ultimate concerns" of individuals, *see id.*, 380 U.S. at 187, 85 S.Ct. at 865; *International Society for Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 440–41 (2d Cir.1981), and the Second Circuit has stated that one touchstone of a religion is present where a believer will categorically disregard elementary self-interest rather than transgressing religious tenets, *United States v. Allen*, 760 F.2d 447, 450 (2d Cir. 1985) (citing *Barber*, 650 F.2d at 440, and *United States v. Kauten*, 133 F.2d 703, 708 (2d Cir.1943)). *See also, e.g., Africa v. Commonwealth of Pennsylvania*, 662 F.2d 1025 (3d Cir.1981), *cert. denied*, 456 U.S. 908, 102 S.Ct. 1756, 72 L.Ed.2d 165 (1982); *Stevens v. Berger*, 428 F.Supp. 896 (E.D.N.Y.1977).

■ Whatever definition of religion courts should use in adjudicating controversies calling into question governmental actions in the name of liberty of religious belief and practice, there can be little doubt that the beliefs that plaintiffs have espoused in their pleadings, affidavits, and courtroom testimony qualify as "religious". Paragraph 12 of the Sherrs' complaint sets forth the Sherr family's beliefs in a nutshell:

> [A]ll persons must live in harmony with the mutual world and its order and must not interfere with the natural order. All things are part of one intimate universe, or whole; there is a definite order to the universe. This universe includes everything good being called God. Health is the unhindered expression of life (God) moving through the body, mind and heart. Therefore, anything that hinders life's expression is contrary to [the Sherrs'] religious belief. Immunization hinders life (God) and thus is contrary to

---

5. Given the Court's holding that the restriction of the religious exemption § 2164(9) provides to "bona fide members of a recognized religious organization" violates the establishment and free exercise clauses of the First Amendment, the Court need not address plaintiffs' challenges to the limitation under the equal protection clause of the Fourteenth Amendment.

God. To deviate (immunize) from this natural order would be to sin.

Alan Paul Sherr further expanded on the family's beliefs in the affidavit he filed with the Court and during the course of his testimony, stating on the stand, for instance, that "I see God as being pervasive everywhere, and God defined, in form, you might say, as life. And I see myself as God in expression or life in expression. So you might say that as a human being I am life in expression," and that "[a]nything that is 'contrary' to the expression of life, hinders one's health. Immunization in my eyes, in the framework of my religious beliefs and in my wife's, I might add, interferes with the health of the organism...." (Record at 20, 23–24).

Paragraph 14 of the Levy's complaint reads:

Plaintiffs' sincere religio[us] are as follows: The Universe and all things in it are the manifestation of Divine Consciousness or God. God is spirit and all God's creation is spirit manifesting in infinite variety and form including the physical or material form. Spirit is infinite and indestructible; God is loving and in perfect harmony. Creation is a reflection of that Love and Harmony. Plaintiffs believe that as spiritual beings manifesting physical form in God's perfect creation, they are also reflections of that Love and Harmony.

All of Creation is interconnected. Plaintiffs cannot separate themselves from God and the rest of Creation because of the Cosmic Law of Oneness. It is when Plaintiffs believe they are somehow separate from the rest of Creation that disharmony and therefore disease results. This disharmony can cause apparent disturbances in the mental, emotional or physical aspect of the incarnate being, but since it is not caused at the physical level, they believe that to treat it on that level is not really dealing with the problem at its source. Vaccinations, and other forms of medical intervention do not take into account the spiritual nature of disease, and therefore they are a violation of God's natural and spiritual laws. This is abhor[r]ant to Plaintiffs, as they have made an effort over the years to live in accordance with God's Universal laws as they understand them and integrate them into their daily lives.

Louis Levy's complaint reiterates the family's beliefs and during his testimony Levy stated, among other things, that, "to us [Louis and Valerie Levy] religion is not part and parcel, religion is not a temple, religion is not something that is outside of ourselves, something that we live and it's inside of ourselves. It's something that we feel the world in such a way that is interconnected; that we can't separate our concept of God with what is inside of us and around us," and that "[w]e take the same concept about religion into the field of health.... We feel that any introduction into that process of a foreign element outside the normal processes of the body, is going to [a]ffect the body adversely and, therefore, we feel it is a violation in a sense of our nature, physical, spiritual religious nature." (Record at 56, 59, 60–61).

The beliefs to which the Sherrs and Levys expressed their adherence, which Professor Ramsey categorized in his testimony as "pantheistic,"[6] surely can be classified as religious for purposes of the Court's adjudication of plaintiffs' cases. Plaintiffs' various descriptions of their beliefs are replete with reference to "God" and reveal that these beliefs are rooted in matters of "ultimate concern" to the Sherrs and Levys, and plaintiffs' very refusal to have their children immunized and ensuing legal battle with the school district and state defendants manifests a dedication to their principles that may seem to an outsider to fly in the face of the best interests of Alan Paul and Claudia Sherr and Louis and Valerie Levy and their children. The Court therefore finds that the beliefs which each set of plaintiffs has put forth as the basis

6. Webster's Third New International Dictionary defines "pantheism," in the sense Professor Ramsey is using the term, as "a doctrine that the universe conceived of as a whole is God: the doctrine that there is no God but the combined forces and laws that are manifested in the existing universe."

for their claim of entitlement to the exemption from vaccination § 2164(9) makes available should rightfully be classified as "religious" for purposes of this litigation.

## VII. SINCERITY OF PLAINTIFFS' BELIEFS

In order for plaintiffs to be afforded the exemption from immunization that they seek, it is not sufficient merely that the beliefs that they assert as grounds for exemption be religious in nature. It must also be demonstrated that the espoused beliefs are sincerely held and that the stated beliefs, even if accurately reflecting plaintiffs' ultimate conclusions about the advisability of inoculation of their children, do in fact stem from religious convictions and have not merely been framed in terms of religious belief so as to gain the legal remedy desired.[7]

Attempts to ascertain the sincerity of claims of religious belief must be undertaken with extreme caution. The Second Circuit observed in *Barber:*

Sincerity analysis seeks to determine the subjective good faith of an adherent. . . . The goal, of course, is to protect only those beliefs which are held as a matter of conscience. Human nature being what it is, however, it is frequently difficult to separate this inquiry from a forbidden one involving the verity of the underlying belief.

650 F.2d at 441. Any form of governmental investigation into the "objective truth" of a person's religious beliefs, be it in a judicial form or otherwise, in essence puts the individual on trial for heresy. *See United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). As the Supreme Court emphasized in *Seeger,* however:

While the "truth" of a belief is not open to question, there remains the significant question whether it is "truly held." This is the threshold question of sincerity

which must be resolved in every case. It is, of course, a question of fact. . . .

380 U.S. at 185, 85 S.Ct. at 863. *See also, e.g., Africa,* 662 F.2d 1025; *Stevens,* 428 F.Supp. 896; Riga, *Religious, Sincerity, and Free Exercise,* 25 Catholic Lawyer 246 (1980).

■ In the papers the Sherrs have filed with the Court and in Alan Paul Sherr's testimony on his family's behalf, the Sherrs have couched their opposition to vaccination of their son Jared in the language of religion. Upon careful consideration of all the evidence put forward in this litigation concerning the Sherr family, their asserted beliefs, and the actions they have taken over the last several years with regard to their desire to avoid inoculation of their children, however, the Court finds that, although the Sherrs are clearly genuinely opposed to immunization, the heart of their opposition does not in fact lie in theological considerations. The Court is of the opinion, in other words, that although the Sherrs' voiced resistance to vaccination is no doubt sincere, their claims of a sincerely religious basis for their objections to inoculation are not credible.

The evidence presented reveals that when Alan Paul and Claudia Sherr registered their elder son Scott Daniel Sherr for kindergarten in the Northport-East Northport school system in February 1985, they produced an affidavit requesting that Scott be exempted from § 2164's immunization requirements because the Sherrs were members of "The American Natural Hygiene Society, Inc." a "national non-profit, tax-exempt, health-education organization." The affidavit stated that the society "rejects the theory and use of compulsory inoculations under any circumstances, as a matter of science, safety, and conscience," and that members of the society "are opposed to inoculations as violating the natural laws of life and health by intro-

---

**7.** The school district defendants have challenged the sincerity of plaintiffs' assertions of religious beliefs that prohibit the vaccination of their children. Although counsel for the state defendants participated in cross-examination of Alan Paul Sherr and Louis Levy concerning the beliefs they and their families purportedly hold, the state defendants declare in the papers they filed subsequent to the taking of plaintiffs' testimony that they do not now question the sincerity of plaintiffs' avowed adherence to their respective systems of belief.

ducing pathological toxins into a healthy, human body." Nowhere in the document is there any mention of a religious foundation for the beliefs of the society's members. The school district rejected the Sherrs' claim for an exemption, and Scott entered school after receiving the requisite vaccinations.

In February 1987, plaintiffs registered Jared for kindergarten and submitted documents signed by one Gustave Dubbs, minister of "The Missionary Temple at Large, Universal Religious Brotherhood, Inc." in Sarasota, Florida, indicating that the Sherrs were members of this group and that the temple adheres to, among other things, belief in spiritual healings and opposes compulsory immunization. Investigation by the school district uncovered that the local Sarasota schools were not familiar with the temple, that it had no formal organization or structure, conducted no religious services, and operated out of Dubbs's home. The "temple," in other words, was nothing more than a "mail order church." The school district therefore rejected the Sherrs' request that Jared be granted an exemption from inoculation.

In July 1987, the Sherrs sent a letter to Dr. Brosnan informing him that they had retained counsel, stating that they believed they were entitled to an exemption under § 2164(9), and setting forth in a series of numbered paragraphs their asserted religious beliefs.[8] The letter made no mention of either The American Natural Hygiene Society or Gustave Dubbs's temple in Florida, and the beliefs the Sherrs claimed in the letter to be their own bore a striking resemblance to those which the plaintiffs in *Allanson* had asserted in their successful suit in front of Judge Miner.[9] The Sherrs

8. The Sherrs' letter reads, in relevant part:
Our religious beliefs are as follows:
1. To live in harmony with the natural world and its order, and not sep[e]rate from our daily lives.
2. We are inclined to live in a way that will promote love and harmony among all people, animals, plants and the natural world.
3. We are opposed to anything that interferes with this natural order.
4. We are not dogmatic or rigid in our actions or thinking[;] flexibility and constant change are necessary to life itself.
5. We respect people[']s desires to live a long time, to avoid pain and to seek happiness according to their unique needs and desires.
6. We believe that all things are part of one intimate universe or whole. This universe includes everything good being called GOD.
7. We believe in a definite order to the universe, and that everything follows and is a result of this order.
8. We believe that life is not characterised by disease. Another word for life is God and one characteristic of God is health.
9. We believe that life is the end result[ ] of the truth of love and life therefore has inherent to it design and control.
10. We believe that health is the unhindered expression of life moving through the body, mind and heart. Therefore anything that hinders life's expression is contrary to our beliefs. Immunization, therefore, hinders life and thus is contrary to God.
11. We believe that when the identity is focused on disease, disease is what manifests[;] when it is focused on life, life is what manifests. All medications and pharmaceuticals are defensive, indicating a focus on disease; life is offensive, therefore medications are not required. Life begets life and health begets health. This is God's way[;] to deviate could be sinning. Immunization, therefore, focuses on disease and is contrary to God's way and is therefore sin.
12. We believe thou shall love the lord thy God, ... not thou shalt love disease ... the stance is one of life, not disease or in religious terms the devil.
13. We believe there is one God, one whole. The whole is greater than the sum of its parts not the sum of the parts equal[s] the whole.

9. Judge Miner sets forth Robert and Kathryn Allanson's beliefs at some length in his decision in their case:
As described by plaintiffs in papers earlier submitted to the Court, [plaintiffs'] "beliefs" consist of the following:
"All persons and phenomenon are following a grand natural order, which should not be interfered with. All things are inter-connected and operate harmoniously. Man's existence on earth is best served by not disturbing this natural order. Immunization is abhorrent to these beliefs, and plaintiffs vehemently oppose such practices as they are contrary to plaintiffs' beliefs.
"These beliefs and faith in this grand natural order is something to which all is virtually dependent on or subordinate to, and occupies a paramount position in plaintiffs' daily lives, much the same as traditional notions of religion occupied in the lives of its believers."
Affidavit of Robert Allanson, Paragraphs 15 and 16.
Plaintiffs have amplified this description in the following manner:
Our religious beliefs require us to want to live in harmony with the natural world and its

then filed their action against the school district and state defendants, again modifying their description of their supposed beliefs. *See supra* pp. 92–93 for the Sherr family's beliefs as stated in Paragraph 12 of their complaint.

Alan Paul Sherr's testimony also highlights the dubious sincerity of plaintiffs' purported religious basis for their wish that Jared not be vaccinated. Sherr admitted that he had joined Gustave Dubbs's group solely for the purpose of attempting to gain an exemption for Scott and was not even clear as to the temple's name. Sherr also conceded that he had "paraphrased" the statement of the Allanson's beliefs in Judge Miner's opinion. Additionally, in response to the Court's questioning, Sherr testified that, although he opposed any "intrusion" into the body on religious grounds, he had had Jared X-rayed when it was believed that the boy had broken his leg, allowed dentists to remove decay from cavities his children might have, and had his children circumcised. Furthermore, Alan Paul Sherr is a chiropractor, and during the course of his testimony it became clear that his opposition to vaccinations and attitudes toward sickness and health in all likelihood derive for the most part from his medical and philosophical perspective as a chiropractor and chiropractic ethics, not from any religiously inspired source. The

Court's conclusion, moreover, is buttressed by its observance of Alan Paul Sherr's demeanor and attitude on the stand.

Since the Court finds that the Sherrs do not sincerely hold the religious beliefs they put forth as the foundation for their assertion of entitlement to an exemption from immunization under § 2164(9), these plaintiffs' claim for relief from the refusal of the exemption they seek must be denied.

The Levys, on the other hand, do manifest a complete sincerity about the religious beliefs they embrace. Louis Levy, for instance, testified that he has studied and done a good deal of reading on religion since his teens and has for many years been very involved in religious and spiritual study and activity. The Levys' conception of human existence and the physical world seems to pervade their whole way of life, including their eating habits and methods of combatting illness, and Louis Levy stated that his family's religious precepts concerning vaccinations are in adherence with those of the Christian Science Church. Although the Levys, like the Sherrs, joined a religious organization in an attempt to gain an exemption under § 2164(9), namely "The Church of Human Life Science," that organization does not appear to be a sham like Gustave Dubbs's "temple" in Florida, but an actual group whose views are very much in line with that which the Levys'

order. Our religion is not separate from our daily lives. We are inclined to live in a way that will promote love and harmony among all people, animals, plants and the natural world. We are inclined to avoid, and if necessary, to oppose anything that interferes with this natural order.

However, we try not to be dogmatic or rigid in our actions or thinking—flexibility and constant change are necessary for life itself. We respect people's desires to live a long time, to avoid pain and to seek happiness according to their unique needs and desires.

We believe that all things are part of one intimate universe, or whole. This universe that includes everything good being called God, although we usually do not use this word because many people think of God as an individual consciousness, much like their own. This Oneness or God is understood in many religions to be the ultimate origin and Creator of everything.

We believe that there is a definite order in the Universe, and that everything follows and is a

result of this order, even if we often do not clearly see or understand it.

We believe that in accordance with the universal or natural order, human beings evolved within and are still very much a part of the natural order and what is called "The Natural World." It has been persuasively demonstrated by a modern science that human beings are one species of animal among many, and that we share with other animals certain limitations. These limitations involve the need for certain definite environmental and dietary conditions in order to be healthy and continue to live. For example, human beings need certain amounts of sunlight, oxygen, and various nutrients which are unique to our species. When human beings are without the conditions under which their fundamental heartiness and health develop, and/or are exposed to artificial or unusual conditions or substances, there is the probability of weakening stress and the possibility of bodily damage. *Allanson*, No. CV 84–174, slip op. at 8–11.

hold. It is a fundamental tenet of the group, for instance, that "the integrity of the body be maintained" since "our bodies are the temple of our being." The church, therefore, "reject[s] completely any manner of cutting, puncturing, pollution, intravenous injection of any substance, vaccination, inoculation or any other imposition upon the vital domain" and holds that "all drugs and vaccines are ethically, morally, religiously, mentally and physically wrong, being at variance with our Creator's Mandate." Louis Levy, moreover, greatly impressed the Court with the seriousness with which he has contemplated the foundations of his religious beliefs and their implications for his family's daily life, and with the thoughtfulness with which he considered the theological ramifications of the questions posed to him.

█ Accordingly, the Court finds that the Levy family holds sincere religious beliefs which would be violated by the mandatory vaccination of Sandra Jasmine Levy as a condition of attending school. The Levys, therefore, are entitled to a religious exemption from inoculation under § 2164(9).

## VIII. SCOPE OF INJUNCTIVE RELIEF

The Court has found that one of the sets of plaintiffs in these consolidated cases is entitled to a religiously-based exemption to vaccination of their child under § 2164(9). The Court will now turn to the proper form and scope of the relief it should order in this litigation.

The Court has ruled that the denial to the Levys of a religiously-based exemption from the otherwise compulsory vaccination of Sandra Jasmine Levy violates the family's constitutional rights. Section 2164(9)'s restriction of the availability of such an exemption to "bona fide members of a recognized religious organization" is at odds with the command of the establishment clause and inhibits the free exercise of the Levys' rights to live their lives in accordance with their sincerely held religious principles. The Court, therefore, holds that the Levys are entitled to the religious exemption from immunization that they seek.

The Court is of the opinion, however, that an order merely granting these individual plaintiffs relief with respect to themselves would be insufficient. In their pleadings, the Levys ask the Court not only that it find them to fall within the scope of § 2164(9)'s exemption, but also that it declare § 2164(9)'s limiting language to be unconstitutional. As the Court has discussed above, *supra* § V, it is in full agreement with plaintiffs' contention that the clause of § 2164(9) at issue in this litigation is blatantly unconstitutional. The Levys' situation is far from unique. The school district defendants have pointed out that schools are regularly confronted with claims of religious exemptions by families who may not actually be members of recognized organized religious groups that oppose vaccination on doctrinal grounds, and the New York State Commissioner of Education has taken the firm position that school districts are to apply § 2164(9) in literal conformance with its restrictive language, *see, e.g., Matter of Van Druff,* 21 Educ.Dept.Rep. 635; *Matter of Curtin,* 20 Educ.Dept.Rep. 473; *Matter of Maier,* 12 Educ.Dept.Rep. 56. The regulations promulgated by the New York State Commissioner of Health, furthermore, recognize as a legitimate basis for a religiously-based exemption from inoculation only "a written and signed statement from the person in parental relation to the child that such person is a bona fide member of a specified recognized religious organization whose teachings are contrary to immunization." The relevant regulation continues, "The principal or person in charge of the school may require supporting documents from the religious organization specified." 10 N.Y.C.R.R. § 66.3(d). Section 2164(9) as presently written, construed, and applied, therefore, creates ongoing problems of constitutional magnitude for individuals throughout New York who maintain religiously grounded opposition to vaccination but do not belong to a religious organization recognized by the state.

The Supreme Court has consistently endorsed the taking of broad judicial steps to rectify the restraints on individual liberties that laws infringing upon First Amendment freedoms impose. Where separate, lengthy adjudications in the context of a multitude of specific factual circumstances may well be the price of a federal court's refusal completely to eradicate patently unconstitutional state or local governmental action by abstaining or restricting its remedy so as to address solely the particular facts before it, the Supreme Court has found the price too high. The Court, for instance, struck down an overly vague loyalty oath where the Court found it "fictional to believe that anything less than extensive adjudications, under the impact of a variety of factual situations, would bring the oath within the bounds of permissible constitutional certainty." *Baggett*, 377 U.S. at 378, 84 S.Ct. at 1326. More recently, just last term the Court unanimously held facially unconstitutional a resolution banning "all First Amendment activities" within the central terminal area of Los Angeles International Airport, stating, "[I]t is difficult to imagine that the resolution could be limited by anything less than a series of adjudications, and the chilling effect of the resolution on protected speech in the meantime would make such a case-by-case adjudication intolerable." *Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus, Inc.,* —— U.S. ——, ——, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987).

Section 2164(9)'s limiting clause has been on the books for over twenty years. Despite several state court opinions attempting to apply subsection 9's religious exemption in a manner that would alleviate its unconstitutionality, the state has steadfastly refused to modify either the language of § 2164(9) or its interpretation of the provision. All the while, there has remained in effect a statutory scheme that violates the establishment clause by inhibiting the practice of certain individuals' religion and entangling government with religion by mandating official governmental recognition of certain religious denominations and impedes the free exercise of religion by individuals who oppose inoculations on religious grounds but do not belong to any "state approved" religious group. This cannot be allowed to continue.

The Court, therefore, hereby enjoins each of the defendants from unconstitutionally applying the religious exemption from vaccination that § 2164(9) creates so as to make the exemption available only to "bona fide members of a recognized religious organization." Defendants' restriction of the exception in such a manner violates both religion clauses of the First Amendment. The United States Constitution mandates that, if New York wishes to allow a religiously-based exclusion from its otherwise compulsory program of immunization of school children, it may not limit this exception from the program to members of specific religious groups, but must offer the exemption to all persons who sincerely hold religious beliefs that prohibit the inoculation of their children by the state.

## IX.  DAMAGES

One final matter need be addressed. In their complaint, the Levys state that they seek, in addition to a declaration of their entitlement to a religious exemption under § 2164(9) and the unconstitutionality of restricting § 2164(9)'s exemption to "bona fide members of a recognized religious organization," an award of four million dollars as damages, together with the costs and disbursements of their action and attorneys fees pursuant to 42 U.S.C. § 1988. The proceedings held before the Court and the papers the parties have submitted have focused entirely on plaintiffs' claims for non-monetary relief and the legal issues surrounding that aspect of the litigation. The Court, therefore, does not deem it appropriate that it attempt to rule upon plaintiffs' request for monetary compensation at this time. Plaintiffs shall notify the Court as to whether they wish to pursue their damages, costs, and fees claims by no later than Friday, November 6, 1987. The Court will then, if necessary, establish a

timetable for any discovery, hearings, and filing of papers that may be required.[10]

## X. SUMMARY

For the reasons set forth throughout this opinion, the Court hereby holds that:

1. The Court should not abstain from assuming jurisdiction over the Sherrs and Levys' actions.

2. The Sherrs and Levys have standing to pursue their respective actions.

3. Section 2164(9)'s limitation of the availability of a religiously-based exemption from immunization to "bona fide members of a recognized religious organization" whose doctrines oppose such vaccinations violates both the establishment and free exercise clauses of the First Amendment to the United States Constitution.

4. The respective beliefs espoused by the Sherrs and Levys as the bases of their claims of entitlement to religiously-based exemptions from immunization under § 2164(9) must both be classified as "religious" in nature for purposes of this litigation.

5. Although the Sherrs genuinely oppose vaccination of Jared Ryan Sherr, they do not sincerely hold the religious beliefs that they put forth as the basis for their claim of entitlement to a religious exemption from immunization under § 2164. The Sherrs, therefore, are not entitled to the religious exemption that they seek, and their complaint must be dismissed.

6. The Levys do sincerely hold the religious beliefs that they put forth as the basis for their claim of entitlement to a religious exemption from immunization under § 2164(9). The Levys, therefore, are entitled to the religious exemption from immunization that they seek. Defendants may not require that Sandra Jasmine Levy be vaccinated as a condition of attending school.

7. Defendants are enjoined from unconstitutionally applying the religious exemption that § 2164(9) creates so as to make the exemption available only to "bona fide members of a recognized religious organization," but must offer the exemption to all persons who sincerely hold religious beliefs that prohibit the inoculation of their children by the state.

8. The Court need not rule at this time upon the Levys' request for monetary compensation. Plaintiffs shall notify the Court as to whether they wish to pursue their damages, costs, and attorneys fees claims by no later than Friday, November 6, 1987.

The Clerk of the Court is to enter judgment accordingly.

SO ORDERED.

---

**10.** The Court assumes that the parties are familiar with the Supreme Court's decision in *Memphis Community School District v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986), and have considered any possible relevance to this litigation of the Supreme Court's holding in that case regarding the availability of damages based on the abstract value or importance of constitutional rights.