Luigi and Francesca **FARINA,**
**Plaintiffs**

v.

**THE BOARD OF EDUCATION OF
THE CITY OF NEW YORK,
et al, Defendants.**

**No. 00 CV 5767.**

United States District Court,
S.D. New York.

Oct. 12, 2000.

James Filenbaum, Suffern, NY, for Plaintiffs.

Michael D. Hess, Corporation Counsel of the City of New York (Bruce Rosenbaum and Kevin R. Dantzler, of counsel), New York City, for Defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiffs Francesca and Luigi Farina, individually and as guardians for their minor children Gianluca and Alessio, brought this action against defendant New York City Board of Education, alleging that defendant violated plaintiffs' rights of religious freedom and equal protection of the law under the First and Fourteenth Amendments and 42 U.S.C. § 1983, by refusing to grant plaintiffs an exemption from the immunization requirements of New York Public Health Law § 2164 and prohibiting the children from attending Public School 329 unless plaintiffs have their children immunized. Plaintiffs contend that they are entitled to an exemption under § 2164(9) because they hold genuine and sincere religious beliefs which are contrary to the practices required by § 2164(2) and (7)(a), mandating immunization against six diseases.

Plaintiffs brought the action on September 25, 2000 and sought by order to show cause a temporary restraining order and a preliminary injunction. This Court denied the temporary restraining order, and held a hearing on the preliminary injunction on September 29 and October 2, 2000.

I

The Farinas first attempted on May 1, 1997 to register their older child Gianluca at Public School 215 for the 1997—1998

school year. As part of the registration process, the school secretary asked Francesca Farina to provide immunization records for her son. Then Mrs. Farina presented a letter dated May 1, 1997 addressed to Gail Feuer, Principal of P.S. 215, stating:

> Our family holds genuine and sincere religious beliefs which prohibit the practice of vaccination and invasive treatments and tests by the State. We release the School from this responsibility. With this statement we invoke our rights and are therefore exempt from vaccination pursuant to New York State Public Health Law 2164 (2165), Paragraph 9.
>
> This matter is personal and private. Please keep this confidential statement on file as legal proof of our objection.

The school secretary called the Community School District 21 Superintendent's office, and faxed a copy of Mrs. Farina's letter to Denise Sasso, the school district Health Secretary, who showed it to her supervisor, Anita Malta, executive assistant to the Superintendent. Ms. Malta determined that the letter was insufficient, as "it didn't really give us any information about the nexus between the religious beliefs and the request for an exemption." Ms. Sasso spoke to Mrs. Farina on the telephone at P.S. 215, telling her that the letter was insufficient, and that Mrs. Farina needed to provide additional documentation supporting her religious beliefs relating to immunizations.

The parties disagree about the next sequence of events, but either in a telephone conversation or in a subsequent meeting at the District office, Ms. Sasso asked Mrs. Farina what religion she practiced. Mrs. Farina said her family was Roman Catholic. Ms. Sasso then told Mrs. Farina to support her request with "a letter from the Catholic diocese or from the parish." Ms. Sasso testified that Mrs. Farina responded, "Oh, come on, I'm Catholic. Don't be ridiculous. You know I'm not going to get this documentation... [i]t's really not a religious belief, it's a personal belief." This ambiguous statement may be interpreted either to mean that Mrs. Farina knew her beliefs to be secular rather than religious, or that she meant that her religious opposition to inoculations is personal to her, not official dogma of the Roman Catholic church. Mrs. Farina maintains that Ms. Sasso also told her to change the letter to reflect personal rather than religious beliefs, but that Mrs. Farina insisted that the beliefs were religious.

Mrs. Farina sent a letter to Principal Gail Feuer on May 11, 1997, requesting an appointment to discuss the matter with Ms. Feuer. Mrs. Farina then sent a certified letter on May 21, 1997 to Ms. Feuer asserting:

> "[a]ccording to New York State Public health law 2164, my child's records are complete, and all legal requirements have been complied with in full ... Should you have any questions regarding this matter, I ask that you put them in writing, explain your position and include and/or cite and reference the appropriate statutory authority. If within 10 days I do not receive any such communications, I will consider this matter settled."

On June 7, 1997, Mr. and Mrs. Farina sent a letter to Ms. Feuer that repeated that "our child's records are complete, and all legal requirements have been complied with in full" and added:

> We believe that it is not important for the School District to understand our beliefs, but to respect that we hold them. We are not requesting permission for an exemption: we are invoking our right to claim an exemption.
>
> In the interest of expediting the processing of our child's enrollment papers, we submit the following supporting statements: As the legal and responsible parents, we prohibit the vaccination of our children by the State, as it is contrary to our genuine and sincerely held religious beliefs and practices.
>
> Vaccines are made of man and not God. Our children were created in God's perfect image with physical, spiritual and

emotional aspects balanced and working in unison. The injection or ingestion of such substances would prove injurious to the health and therefore the spirit. We believe we were not meant to interfere with the spiritual wisdom of the organism in this way.

This letter also repeated the language of the May 21st letter requesting that any questions be in writing, with statutory authority, and asserting that the Farinas would consider the matter "settled" if they received no response within ten days. District 21 responded on June 19, 1997 with a letter stating that the letter of June 7 was received and the matter was under consideration.

Francesca Farina testified that during the summer of 1997, Gianluca Farina "regressed with speech and with behavior," and that he was evaluated at Warbasse Nursery School from September to December of 1997. Mrs. Farina presented Warbasse school with a letter on September 30, 1997 which was identical to the letter presented to P.S. 215 on May 1, 1997.

In December of 1997, Gianluca was placed in a special education program at P.S. 329. That school never requested a letter of religious exemption, but received a copy of the letter to Warbasse school with Gianluca's records. Gianluca attended school at P.S. 329 from December 1997 until September 20, 2000.

The Farina's younger son Alessio attended Warbasse Nursery School beginning in 1998, receiving special education services there. His records contained a copy of the Farina's letter to Warbasse regarding Gianluca. In January 2000, Alessio was reevaluated for special education needs, and in June 2000, the Farinas received notification that he would be offered a place in the special education program at P.S. 329. On September 7, 2000, Mrs. Farina brought Alessio to P.S. 329 and was told that he would not be allowed to attend school without an immunization record or a religious exemption.

Mrs. Farina contacted her attorney, who represents the Farinas in this action. He sent a letter to Anita Garcia, Principal of P.S. 329. The letter asserted that his clients have sincere religious beliefs that prohibit them from having their children immunized or inoculated, and stated:

My clients' religious beliefs are as follows:

"We believe in God, the Creator of heaven and earth and all therein. God is the supreme authority over this creation and is all-powerful. We are created in God's image and must not be defiled. As the divine Architect, God designed our bodies to have immune systems, which must not be defiled by immunizations. Immunizations are a violation of God's supreme authority, and therefore, unholy. Since immunizations are 'unholy' they violate our religious beliefs.

We believe that God has created us in His image. In being created in God's image, we are given His immune system. We are bestowed with His gift, the immune system. We believe it is sacrilegious and a violation of our sacred religious beliefs to violate what God has given us by showing a lack of faith in God."

My clients also believe the following quotations from the Bible support their religious beliefs:

"Know ye not that your body is the Temple of the Holy Ghost which is in you, which ye have of God and ye are not your own."

1st COR 6:19

"If any man defiles the Temple of God, him shall God destroy, for the Temple of God is holy, which ye are."

1st COR 3:17

"That your faith should not stand in the wisdom of men, but in the power of God."

1st COR 2:5

P.S. 329 notified Anita Malta of receipt of the letter, and Ms. Malta forwarded it to the Office of Legal Services. On Septem-

ber 20, 2000, Deborah King of the Office of Legal Services notified Ms. Malta that both children should be excluded from school. Anita Garcia of P.S. 329 sent Mrs. Farina a letter on September 20, 2000 stating that "the letter for religious exemption for Gianluca and Alessio Farina does not provide proper documentation to substantiate religious exemption" and that it was "therefore necessary for Gianluca and Alessio Farina to be excluded from school effective immediately." This action followed.

## II

■ To obtain a preliminary injunction, plaintiffs must show: "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly toward the party requesting the preliminary relief." See *Deeper Life Christian Fellowship, Inc. v. Board of Education,* 852 F.2d 676, 679 (2d Cir.1988) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam)).

Plaintiffs meet the first element of the test. The Supreme Court has stated: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976); see also *Deeper Life,* 852 F.2d at 679.

The second element of the test requires an evaluation of the merits of plaintiffs' claim that they have been improperly denied religious exemption from immunizations for schoolchildren required by New York Public Health Law § 2164. The statute provides, in pertinent part:

(2) Every person in parental relation to a child in this state shall have administered to such child an adequate dose or doses of an immunizing agent against poliomyelitis, mumps, measles, diphtheria, rubella and haemophilus influenzae type b(Hib), which meets standards approved by the United States public

health service for such biological products, and which is approved by the state department of health under such conditions as may be specified by the public health council.

(7)(a) No principal, teacher, owner or person in charge of a school shall permit any child to be admitted to such school, or to attend such school, in excess of fourteen days, without the certificate provided for in subdivision five of this section or some other acceptable evidence of the child's immunization against poliomyelitis, mumps, measles, diphtheria, rubella and, where applicable, haemophilus influenzae type b(Hib)

. . . .

(9) This section shall not apply to children whose parent, parents, or guardian hold genuine and sincere religious beliefs which are contrary to the practices herein required, and no certificate shall be required as a prerequisite to such children being admitted or received into school or attending school.

■ Because the statutory exception of § 2164(9) is for persons whose opposition to immunizations stems from genuine and sincere "religious" beliefs, it does not extend to persons whose views are founded upon, for instance, "medical or purely moral considerations," *Sherr v. Northport–East Northport Union Free School Dist.,* 672 F.Supp. 81,92 (E.D.N.Y.1987), "scientific and secular theories," or "philosophical and personal" beliefs. See *Mason v. General Brown Cent. School Dist.,* 851 F.2d 47, 51–52 (2d Cir.1988). Thus, the Court must first determine whether plaintiffs' purported beliefs are religious, and only if they are, determine whether those beliefs are genuinely and sincerely held.

■ The Court must also take care to avoid making impermissible assessments of the credibility of the beliefs themselves. See *International Society for Krishna Consciousness, Inc. v. Barber,* 650 F.2d 430, 441 (2d Cir.1981). The beliefs need not be consistent with the dogma of any organized religion, whether or not the

plaintiffs belong to any recognized religious organization. *Sherr*, 672 F.Supp. at 91. Thus, Denise Sasso's questions to Mrs. Farina about the Farinas' religious affiliation, and her statements to Mrs. Farina that she obtain a letter from the Roman Catholic diocese or her parish were misplaced. The Farinas had no obligation to provide documentation from the Roman Catholic church regarding their beliefs. Personal religious beliefs, as long as they are in fact religious, are sufficient under the statute if sincerely and genuinely held.

Religious convictions are inherently subjective, and the Court cannot look directly into the minds of the plaintiffs. But the Court may, as in any state of mind inquiry, draw inferences from the plaintiffs' words and actions, in determining whether they hold genuine and sincere religious beliefs against inoculations.

■ The Court is convinced that the Farinas sincerely and genuinely oppose vaccinations for their children, but is not convinced that those objections are religious in nature. The preponderance of the evidence adduced at the hearing leads the Court to conclude that the Farinas' objections to immunization are personal and represent a belief that inoculations would e damaging to the physical health of their children.

While the plaintiffs presented testimony and documentation purporting to express personal religious beliefs, we did not find either the testimony or the documentation persuasive that the beliefs so expressed originated with the plaintiffs themselves, or were sincerely and genuinely held by the plaintiffs. Rather, much of the testimony of both the plaintiffs and the witnesses, as well as significant portions of several documents in evidence, struck the Court as the product not of the plaintiffs own deeply held conviction, but rather more plausibly as expressions the plaintiffs borrowed from outside sources in their effort to obtain the exemption.

Mrs. Farina's testimony was often evasive and inconsistent. That she did not choose to testify in her own behalf gave the Court pause, since it is clear from the record that Mrs. Farina leads the effort to prevent her children from being immunized, and is the likely driving force behind this litigation.

Luigi Farina, an information technology manager at a large law firm, testified that he downloaded extensive information concerning immunization from the Internet, including the New York Public Health statute. He also testified that he and his wife worked together on all of the correspondence to the schools and the District. Yet Francesca Farina's testimony regarding her knowledge of her husband's research on the Internet was evasive and inconsistent. She testified that she and her husband composed the letters to the schools, and that her husband found information on the Internet which helped in writing the letters.

In particular she said that her husband found information on the Internet concerning "what [their] legal rights were within the school system," and that her husband had searched the Internet for parents who "have the same beliefs" as the plaintiffs. Yet when asked if her husband had relayed to her what he had found on the Internet, Mrs. Farina was evasive:

Q: You said your husband did some research on the Internet.

A: Right.

Q: Do you know what he found on the Internet?

A: I'm not sure what he found.

The Court: Did he tell you what he found?

A: Well, actually, he was trying to find parents that have the same beliefs as we do.

Q: Did you find parents who had the same beliefs as you did?

A: Yes.

Q: Were these parents members of some organization?

A: I don't think so.

Q: How did you find them?

A: I've never been on the Internet myself.

Q: Did your husband tell you whether or not these parents were members of some organization?

A: No.

Q: Did he tell you how it was that he acquired the names of these other parents?

A: I don't know the exact procedure. I believe he got it from the Internet.

Q: Did you speak with these other parents?

A: No, I don't speak on the Internet.

Q: Did your husband speak with these other parents?

A: Most probably.

Q: Did he tell you what these other parents told him?

A: No. What do you mean?

Q: You said that you were looking to see whether or not there were other parents who had similar objections to vaccinations as you did, right?

A: Yes.

Q: And you also said that your husband looked on the Internet to try to find other couples who might have had similar views as you and your husband, correct?

A: Yes.

Q: I'm asking you whether or not your husband as a result of his research relayed to you the results of his contacts with other parents?

A: Yes.

Q; What did he tell you that they told him?

A: They had similar beliefs.

Q: What beliefs were those?

A: Religious.

Q: Did they go into the details about what the nature of their beliefs were?

A: I don't know, sir.

Mrs. Farina's later testimony on the same topic also lacked credibility:

Q: Your husband testified about research that he performed on the Internet and that he read various things and spoke with a number of people in reaching the decision jointly with you that your children should not be immunized. Did he tell you who he spoke with, what Internet sites he visited?

A: No.

Q: Did he tell you anything at all about the details of his research?

A: All I know is that we made a spiritual decision.

Q: But I'm trying to find out whether or not you know the names of any of the people with whom he testified he had spoken on this issue?

A: No.

Q: Did you speak with anyone about this issue?

A: No.

Q: Aside from the people who came here to testify on your behalf?

A: No.

We find it implausible that Mr. Farina would not inform his wife in detail about his findings on a matter of apparently vital importance to the Farinas. Mr. Farina testified that he would "probably burn in hell" for having his older son immunized prior to the age of eight months. Mrs. Farina testified, as did her brother Antonino Noto, that she believed she was "living in sin" as a parent when her older son, Gianluca, was vaccinated. It strains the Court's credulity to be asked to believe that this is an issue of the highest spiritual consequence to the Farinas and that they worked together on preparing letters asserting their claim, but that Mr. Farina did not speak to his wife about help he may have found on the Internet. It is more plausible to suppose that Mr. Farina would convey to his wife virtually every piece of pertinent information he may have found on the Internet, including correspondence with others who may have been sympathetic to his and his wife's objections to immunizations and helpful in their efforts.

Mrs. Farina was similarly vague when asked how she came in contact with her attorney in the case. She testified that she had "his name and number for over

three years," and that she found his name in a publication entitled "Health Science." She testified that her girlfriend subscribed to the magazine, and that she had read it "a little bit." She knew it was published monthly, but would say only that she "assumed" it talked about health problems.

It turns out that Health Science magazine is published by the American Natural Hygiene Society, an organization devoted to something called Natural Hygiene. This is described on the Society's website as "a philosophy and a set of principles and practices based on science that lead to an extraordinary level of personal health and happiness." Among its basic principles, it includes a statement that "Health is the normal state; healing is a biological process and is not something you can buy . . . nothing that makes a well person sick can make a sick person well." The philosophy purports to enhance physical, emotional and mental health, but does not make any mention of religious or spiritual well-being.

One cannot subscribe to the magazine without joining the organization. A related website further describes Natural Hygiene: "Natural hygiene advocates: vegetarianism, freedom of choice in healthcare (opposes compulsory treatment or procedures of any kind—vaccinations, fluoridation in water . . . )." Natural hygiene adherents believe that the body is self-healing. Mrs. Farina's denial that any of her friends or family members are opposed to vaccinations seems implausible if she selected her attorney out of a friend's subscription to a magazine only obtainable to members of such an organization.

When asked about her husband's testimony that he had learned from the Center for Disease Control that numerous people had contracted Polio from vaccines, she was evasive:

Q: Did he ever tell you that in your discussions at home?

A: All I can say is that lately this issue has been all over the news and TVs.

Q: What has been all over the news?

A: Whatever my husband said.

The Court: What do you mean your husband was telling you?

A: I'm sorry?

Q: What is all over the news, what do you mean by that?

A: There has been more attention—more talk about vaccinations and injuries.

Q: That vaccinations are harmful?

A: There has been more in the media and that's what my husband testified about.

There has in fact been recent media attention concerning alleged links between immunizations and disease. This may be at the heart of plaintiffs' objections to immunization. A cursory exploration of the Internet yields several easily accessible websites both in favor of and opposing immunization.

Researchers consistently find that the incidence of any adverse reaction to vaccines whether mild or severe, is extremely low (.08% in 1995, for example), and that includes reactions as mild as a brief elevation in body temperature. But the current generation of parents, who fortunately grew up relatively free, at least in this country, from these crippling communicative diseases due to the success of vaccines, have become more concerned with their possible adverse effects. Luigi Farina testified, "there are countless cases . . . where the person got vaccinated against polio and the person got polio." The Farinas apparently believe this.

Of particular relevance is the recent release of a preliminary study published in the British medical journal *Lancet* by Dr. Anthony Wakefield, tying the MMR (Measles, Mumps, Rubella) vaccine to regressive developmental disorder. Mrs. Farina's repeated statements that her older son, who had been immunized before the age of eight months, "regressed in speech and behavior" during the summer of 1997 raises the likelihood that the Farinas' con-

cerns are for their child's physical rather than his spiritual health.

The Court also found implausible Mrs. Farina's testimony that her pediatrician, to whom the children are brought for yearly examinations, allegedly expressed no opinion whatsoever concerning the possible health risks of failing to vaccinate the children. When asked what her physician told her about vaccinations, Mrs. Farina testified, "[s]he is respecting my wishes." On further questioning, she maintained that her physician expressed no opinion one way or the other.

The Farinas impressed the Court as caring and diligent parents, and they each testified that they underwent extensive deliberation in arriving at their decision not to permit immunizations. It seems likely that such parents, seeking to make a decision of great importance to their children's well-being, would insist on hearing the pediatrician's opinion in the process. It is equally inconsistent that Mr. Farina, a practicing Roman Catholic who testified at great length about his upbringing in Rome in close contact with leaders of the Roman Catholic faith, would neglect to consult with his priest concerning a matter that allegedly caused him and his wife such spiritual turmoil.

The Farinas' testimony concerning the nature of their beliefs was also inconsistent. Their initial contention, and the testimony of their witnesses, was that their objection to immunization was based solely on the injury they believed was inflicted on the spirit, and not on concerns for the physical health of their children. Luigi Farina testified that the body is "nothing but a shell" and made distinctions between the body and the spirit: "there are two kinds of death that you have to consider... the death of the body, and the death of the spirit" and "the death of the body you have no control over ... the death of the spirit is something I have control over ... if I decide to soil my spirit ... that's my decision." In the same vein, when asked why the use of anti-perspirant was not objectionable, Mr. Farina replied, "That's not taking care of my spirit, having anything to do with anything spiritual." All of the witnesses denied that they had ever heard the Farinas express concerns about immunization other than spiritual concerns. But Mr. Farina later said that "the body and the spirit are one and the same, because [God] created the function to work together."

Similarly, Mrs. Farina first denied any concerns about the potential effect of immunization on the physical health of her children, testifying that she had not learned anything at all about possible health problems or learning problems of her child that might have influenced her decision not to immunize. But Mrs. Farina later stated that injury to the body was caused by immunization:

Q: So I ask you again how does immunization defile the immune system?

A: That's not the part what I'm saying.

The Court: Excuse me, maybe I'm misreading here.

A: Saying that God has created us with an immune system.

The Court: But must not be defiled by immunization. And the question is why would an immunization defile it?

A: Because it would endanger our spirit as well, sir because.

Q: It would also endanger the child's health as well, isn't that right?

A: Subsequently, yes.

The Farinas also made a connection between damage to the health and damage to the spirit in the letter of June 7, 1997 to P.S. 215, in which they wrote, "The injection or ingestion of such substances would prove injurious to the health, and therefore the spirit." Thus, the Farinas' denials that they have concerns about alleged health problems caused by inoculations are contradicted by their own testimony and written statements.

The content of the Farinas' letters to the schools presents serious credibility problems. In general, it seems plausible that much of the language used by the Farinas

was found in their research on the Internet. As Mr. Farina testified, "I forget where the article came up, that I was more or less quoting in one of those letters: God made this body. God made the soul that's in this body. Your soul is in this container for as long as you're on earth. Do not soil the container or the inside."

The letter of May 1, 1997 contains form language almost identical to a document received as Defense Exhibit A, called a "Legal Exemption from Vaccination per compliance with State Statute Provisions," typed on letterhead which purports to be from the State of New York, Department of Health, but Ms. Malta of District 21 testified that the Department of Health issues no such letter. The document was not written by the Farinas, yet Mrs. Farina's letter of May 1, 1997 is strikingly similar to it, containing several identical sentences, and overall differences only in style and sequence.

The letter of September 7, 2000 is more troubling. A comparison between it and Defendant's Exhibit E, written on behalf of another person seeking a religious exemption from vaccinations, reveals that many sentences are replicated verbatim. Of particular importance is one of the paragraphs following the sentence, "My client's religious beliefs are as follows:" and contained in quotation marks. It states:

> "We believe that God has created us in His image. In being created in God's image, we are given His immune system. We are bestowed with his gift, the immune system. We believe it is sacrilegious and a violation of our sacred religious beliefs to violate what God has given us by showing a lack of faith in God."

The same paragraph appears in Defendant's Exhibit E, with the only difference that the first sentence reads, "We believe in God and that God has created us in His image" and there is an additional sentence at the end, "Immunizations are a lack of faith in God and His way, the immune system." The expression that immunizations represent a lack of faith in God comes up repeatedly in the Farinas' case as well. Both Mr. and Mrs. Farina testified to this idea, as did several of their witnesses. Thus, Mrs. Farina's assertion that these expressions in the letter of September 7, 2000 were "what we discussed" and that they "expressed my beliefs" is implausible. Even taking into account that plaintiffs' counsel might paraphrase the Farinas' discussion of their beliefs into language which previously may have been useful in expressing similar sentiments of others, the identical expression of these ideas undermines any contention that these are genuine, sincere religious beliefs held personally by the plaintiffs. Mrs. Farina's assertion that she provided her attorney with the three quotations from Corinthians contained in the letter of September 7, 2000 is equally improbable. Those same quotations are contained in Defendant's Exhibit E.

The Farinas' repetition verbatim of boilerplate religious sentiments and biblical quotations would not, on its own, render the statements incredible. But their insistence that their objections to immunization are the result of their personal, individualized interpretation of scripture arrived at through personal spiritual contemplation, gives the Court reason to doubt the sincerity of the expressed beliefs.

Mr. Farina testified repeatedly that his beliefs were his own "personal, unique understanding of what [he] read and experienced" and that he had "gotten this out of the Bible." Mrs. Farina's affidavit and the letter of September 7, 2000 both contain quotations which read, "God designed our bodies to have immune systems which must not be defiled by immunizations." Yet, when she was asked why immunization defiles the immune system, Mrs. Farina hesitated, evaded, said she didn't understand the question, asked to see the document, and at one point responded, "That's not the part I'm saying, sir." This testimony casts doubt on the sincerity of

513

both the testimony and the written expressions of religious belief.

The totality of our observation of the witnesses' testimony and our examination of the documents leads the Court to conclude that Plaintiffs' objections to immunization are based on their personal fears for the health of their children, rather than on genuine and sincerely held religious beliefs.

## CONCLUSION

Because the Court finds that Plaintiffs have not shown that they hold genuine and sincere religious beliefs which prohibit immunizations, the motion for preliminary injunction is denied.

So ordered.