Martina CAVIEZEL and Andreas Schenk Caviezel, Individually and as Parents and Natural Guardians of CC, Plaintiffs,

v.

GREAT NECK PUBLIC SCHOOLS, a/k/a Great Neck Union Free School District; Debbie Shalom, in her capacity as Principal, Parkville School Early Childhood Center; Dr. Thomas P. Dolan, in his capacity as Superintendent of Schools, New York State Education Department; David Steiner, in his capacity as Commissioner of Education, Defendants.

No. CV 10–0652(ADS).

United States District Court, E.D. New York.

April 5, 2010.

Patricia Finn, Esq., Piermont, NY, for Plaintiffs.

Frazer & Feldman, LLP by Joseph Carbonaro, Esq. of Counsel, Garden City, NY, for Great Neck Union Free School District; Debbie Shalom and Dr. Thomas P. Dolan.

Andrew Cuomo, Attorney General of the State of New York by Assistant Attorney General Ralph Pernick of Counsel, Mineola, NY, for New York State Defendants.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This is an application for a preliminary injunction to compel the defendant Great Neck Union Free School District ("the School District") to register child CC without being vaccinated, on the ground of a religious exemption.

By Order to Show Cause, the plaintiffs move, pursuant to Federal Rule of Civil Procedure 65, for the following relief during the pendency of this action:

(1) Enjoining the defendants from precluding the plaintiffs from registering with the defendant School District;

(2) Enjoining the defendants from rejecting the plaintiffs application for a religious exemption to vaccines; and

(3) Enjoining the defendants from requiring the plaintiffs to use any variation of the State "Request for Religious Exemption to Immunization Form."

The Court signed the Order to Show Cause on February 18, 2010, striking a temporary restraining order. A hearing on the motion for a preliminary injunction was held on March 15, 2010.

## I. *THE ISSUE*

There is a discrete issue in this motion for a preliminary injunction. The plaintiffs, as parents, desire to register their almost four year old daughter, CC, in the Great Neck School District Pre–K program, without being vaccinated. By the provisions of New York State Public Health Law § 2164, the plaintiffs' child had to be vaccinated with regard to the diseases set forth in the statute. In this regard, the parents rely on the provision of the New York State Public Health Law § 2164 Subdivision 9, which reads as follows:

9. This section shall not apply to children whose parent, parents, or guardian hold genuine and sincere religious beliefs which are contrary to the practices herein required, and no certificate shall be required as a prerequisite to such children being admitted or received into school or attending school.

The issue then, is whether the parents of CC "hold genuine and sincere religious beliefs", which beliefs form the basis of their objection to their daughter's immunization by way of vaccination.

## II. *THE HEARING*

### A. *The Plaintiffs' Case*

Martina Caviezel is the mother of child CC. She has four children. Three are already in the Lakeville School, which is a

public school in the Great Neck School District. Her youngest child, CC, is in a private nursery school in Great Neck. She knows that "it is required that you vaccinate your children so that they can go to school, except if you have a religious belief." (Tr. at 11) *. She was asked why she made an application for an exemption from vaccinations. Her answer is somewhat difficult for the Court to understand and is set forth at length. Mrs. Caviezel responded as follows:

Q. Why did you make that application for an exemption from vaccinations?

A. Because inside of my religious beliefs, which are personal religious beliefs, I don't believe that vaccinations are necessary.

Q. And why is it that you don't believe vaccinations are not (sic) necessary?

A. I just believe if you look at the human being, if you look at the universe, we're divine, we're just divine. It's just the design is perfect. There's no other way to say it. It's just perfect.

THE COURT: What's perfect?

THE WITNESS: The design of human beings.

THE COURT: The design?

THE WITNESS: The design, like we're divine.

THE COURT: Design of what is perfect?

THE WITNESS: Of the human being, of nature, or this world, of this universe is divine, it's just perfect.

I don't know. Look at how a child is created. Look at how it's just flawless. There's no other word for it. It's just divine.

You know there's the seed, the egg, the baby starts to grow, the whole woman's body shapes so that it allows for that, the breast gets bigger and prepares for the milk. When it's time for the baby to be born, the body knows.

BY MS. FINN:

Q. What is your interest in birthing, and how does that related to your objections to vaccines?

A. I'm a hypnobirthing practitioner. I became a hypnobirthing practitioner.

THE COURT: A What?

THE WITNESS: A hypnobirthing practitioner.

MS. FINN: H–Y–P–N–O birthing.

THE COURT: What does that mean?

THE WITNESS: You prepare parents for the birth of their child.

And so I actually went through the class when I was pregnant with my second son, so I birth with the hypnobirthing method, and I decided to train as a hypnobirthing practitioner between my second and third child.

And as I was working with hypnobirthing more and more, and working with more and more parents, and more and more women, I started to learn more about the amazing miracle that we are.

THE COURT: About what miracle?

THE WITNESS: The amazing miracle that we are.

BY MS. FINN:

Q. When you say "miracle", what do you mean by using the term miracle of birth?

A. It's just divine. I cannot use any other word. It's just divine. Nobody could have created anything

* Tr. Refers to the Hearing transcript.

like that. It's just something that is created by a bigger power.

Q. When you say "created by a bigger power", what do you mean by that?

A. You could call it God, you could call it creator, you could call it mother earth, you could call it destiny.

Q. Do you call it God?

A. I call it God, and I'm a little reluctant to call it God because the name of God has been abused so much. People died in the name of God, people killed in the name of God.

I think by now I'm at the point where I can call it God. I used to call it creator or mother earth or the divine actually.

Q. So when you use terms like mother earth and divine, are you talking about God?

A. I'm talking about God.

Q. What religion, if any, are you a member of, if you are?

A. If I were to explain my religion, I probably would say I'm a Pantheist.

THE COURT: A what?

THE WITNESS: A Pantheist.

MS. FINN: Pantheist, P–A–N–T–H–E–I–S–T.

THE COURT: P–A–N–T–H–E—

MS. FINN: E–I–S–T.

THE COURT: It must be me. P–A–N–T–H—

MS. FINN: E–I–S–T. It's theology, your Honor, pantheology.

THE COURT: You said you're a member of a religion called Pantheist?

THE WITNESS: No.

If I were to define my religion, that's what would define it the closest.

The Pantheist, there's two different issues. One is that you pray to many gods, which is not what applies to me, but the other one is that you see God in everything.

THE COURT: Is that you, you see?

THE WITNESS: That's me.

I see God in everything. I believe God's present.

THE COURT: you say you're not a member of this Pantheist religion?

THE WITNESS: As far as I know, there is no institution.

THE COURT: What?

THE WITNESS: I haven't found an institution who would represent that.

THE COURT: So that you're not a member of any formal religious group?

THE WITNESS: No, I'm not a member of any formal religious group.

BY MS. FINN:

Q. How would describe Pantheism, is it a religion?

How would you describe Pantheism to help us understand what that view is?

A. I would describe it as you see God in everything.

It's spring, so in the flowers in spring when the flowers bloom, in the miracle of birthing, in the waves, the waves at the beach, the eyes of other people.

Q. In pursuit of Pantheism, what practices do you engage in, if any at all?

A. Mostly breathing, to be present, because in breathing, to be present, I can be present to the presence of God.

Most of the times we're rushing and so we lose.

Q. When you say breathing, do you mean breathing meditation?

A. You could call it breathing meditation, yes, but I also mean just stop-

ping for a moment and taking a breath and starting to hear the birds, starting to see the flowers, starting to notice people around you.

Q. What form of prayer, if any, do you engage in?

A. Gratitude.

THE COURT: What?

THE WITNESS: Gratitude, to be thankful.

THE COURT: I think that's going to be helpful. Okay, prayer you consider gratitude?

THE WITNESS: Gratitude.

THE COURT: What did you say after that?

THE WITNESS: I didn't say anything else.

THE COURT: Okay.

BY MS. FINN:

Q. How often do you pray?

A. It's not a moment. It's all through the day. It's just walking and being thankful for—you know, Jewish people have the count 100 blessings. It's similar to that.

It's getting up and being thankful for being able to get up. It's being thankful for being able to, I don't know, look at my children's eyes, being thankful for seeing the birds, being able to see, being able to walk.

Q. What are you teaching your children about God and your beliefs, if any?

A. I definitely teach them gratitude. I believe I teach them to love. I try to teach them because they're going to take whatever they're going to take.

It's just being aware of what their thoughts are about other people and whether their thoughts of other people is true.

(Tr. at 12–18).

Mrs. Caviezel testified about her "practicing religion" and her training from churches or temples or other organizations. She responded that she was ordained as a minister by the Sanctuary of the Beloved, which is a "church", about two years ago. She described her training as a minister in the Sanctuary of the Beloved, as follows:

Q. What training, if any, did you engage in to become a minister?

A. It's an energetic ordination, it was a one day training.

The Sanctuary of the Beloved believes that God is love, and I believe that too, and the Sanctuary of the Beloved believes that everybody, God, in their upbringing trains to be of service with whatever they got in their life in the best of their abilities.

(Tr. at 19).

Mrs. Caviezel also testified that being "of service" means being available to people, for listening, guiding and sending people love and prayers. She stated that she had difficulty using the word "God", but that difficulty has waned. Her explanation for this change is not easy to understand. Apparently, it was inspired by working with pregnant women and "learning more and more about ones body's attributes and how perfectly the design is, how divine it is." (Tr. at 20). Also, she stated her belief that God is the creator of divinity.

Mrs. Caviezel's oldest son is eleven years old. Her faith has become much clearer after he was born. She was raised in Switzerland as a Protestant and was confirmed at age 15. She and her husband chose to be married in a church. Her answer in that regard is somewhat puzzling.

When we got married, we chose to be married in a church because not getting married in the church would be denying it, and we were against the institution and not against the divine.

But in the work that I've done in seeing how—you don't even have to look at how babies, until they're born, you just look at, gosh, how they grow.

Isn't that just incredible, amazing, miraculous, divine.

(Tr. at 21).

In a key question, Mrs. Caviezel was asked how her religion affects her choice not to vaccinate her child.

Q. What efforts, if any, did you make to share these beliefs—withdrawn. Let me step back a minute.

How is it that your religion affects your choice not to vaccinate?

A. I believe it's not necessary. I believe that the human body, the way it's designed, is just perfect. It's a miracle in itself.

I'm sorry, I'm using the word miracle. My vocabulary is limited right now. I'm sorry about that.

(Tr. at 22).

She explained that when her oldest son Nicholas was born, they weren't sure if vaccination was necessary, and it was "just what everybody does." However, as time went by she started to get clearer about who God is and we are, and moved away from vaccinations, and in December 2004 or January 2005, she stopped immunizing her children. Instead, she obtained blood test results from her pediatrician which she submitted to the school. Asked why she submitted the blood test to the school, she again stated that "I thought that immunizations are not necessary...." (Tr. at 23). In addition, she was concerned about dealing with the authorities.

In 2007, Mrs. Caviezel retained counsel to secure an exemption from vaccination under State law regarding her religion. Then she and counsel drafted a letter with regard to her religious beliefs. In September or October 2009, at registration for kindergarten, she submitted this document to the school. She expected to obtain the exemption from vaccination by submitting her letter followed by filling out the form presented to her by the school. Then Principal Debbie Shalom called her after talking to Superintendent Dolan, stating that, most likely her request for exemption would be denied. Principal Shalom also said "she didn't consider it religious beliefs." (Tr. at 31). She had spoken to the person in charge of the school district and he also didn't believe that those are religious beliefs. Hearing this, Mrs. Caviezel was "shocked and outraged," (Tr. at 32), and called her attorney. Thereafter, she received a letter denying the request.

Two months later she received a phone call from the Office of Superintendent Dolan asking for a meeting for her and her husband with the Superintendent; with no attorneys present. She declined to meet with Superintendent Dolan without her lawyer being present, because, "people twist words around sometimes." (Tr. at 35).

Now that her request for exemption from vaccinations had been denied, in order to educate her children, she had to find another school or have home schooling. However, she believes it is important to have her children in the Great Neck school system.

On cross-examination it was brought out that on October 19, 2009, Mrs. Caviezel filled out a State Education Department form entitled "Request For Religious Exemption To Immunization Form." (Plaintiffs' Ex. 1). It is noted that she did not fill out the portion of the form which pro-

vides a space to describe your religious beliefs in your own words. Her religious beliefs were expressed in her attorney's letter, which was made part of the form. She had consulted attorney Patricia Finn, Esq., in 2007, when CC was one year old, in day care, and submitted the letter to the school in September or October 2009.

As to her church, the Sanctuary of the Beloved, which is located in Buffalo; Mrs. Caviezel took a one day course and was formally ordained as a minister. Significantly, she testified that as far as she knows, the Sanctuary of the Beloved does not take any position on the propriety of vaccination and never instructed her that she cannot get her children vaccinated.

Q. But the church, the Sanctuary of the Beloved, is it correct the Sanctuary of the Beloved doesn't take any position with respect to the propriety of vaccination; is that correct?

MS. FINN: Objection.

THE COURT: Do you know that?

THE WITNESS: As far as I know, no, I don't think but I don't know.

BY MR. CARBONARO:

Q. But as far as you know the Sanctuary, during your one day course, the Sanctuary of the Beloved never instructed you that you can't get your children vaccinated; is that correct?

MS. FINN: Objection.

THE COURT: Overruled.

A. No.

Q. So that is correct?

A. That is correct.

Q. So your objections to vaccinations are not based on anything you learned through the Sanctuary of the Beloved; is that correct?

MS. FINN: Objection.

A. That's correct.

THE COURT: Overruled.

(Tr. at 49, 50).

In addition, Mrs. Caviezel testified that her three other children were all vaccinated. In fact, her oldest son is up to date with his immunizations. However, she relies on another method of establishing that her children were immunized against disease, namely a blood test. As she stated, "you can draw blood and it will show if they have immunity for MMR so they don't need the booster for that." (Tr. at 51).

With respect to the word Pantheist, which she described as the closest to her religious beliefs, she defined the term as meaning "God is in everything." This is not a term that she derived from her training at the Sanctuary of the Beloved. However, it was brought out on cross-examination that she also objects to vaccinations because she doesn't know if they are safe or not and may cause autism. Also, she acknowledged that, in this field of study, "it's so personal."

BY MR. CARBONARO:

Q. Ms. Caviezel, do you also object to vaccinations because you believe that they're unsafe?

A. I don't know if they're safe or not. You know, I don't know.

See, I believe that if you know people who got harmed by vaccination, they will say they're not safe. If you know people who got harmed by the disease,

they will tell you that you have to vaccinated. I don't know. I really don't know.

Q. So you think they might be harmful; would that be fair to say?

MS. FINN: Objection.

THE COURT: Overruled.

Q. I don't know.

&ast; &ast; &ast;

Q. Maybe I should take the word research out.

Have you read articles relating to any harmful effects of vaccinations?

A. Yes.

Q. In particular you mentioned autism; is that correct?

THE COURT: You mentioned what?

MR. CARBONARO: Autism.

BY MR. CARBONARO:

Q. Is that correct?

A. Yes.

&ast; &ast; &ast;

Q. So from the perspective of science, would you say that you have some knowledge from what you read of the effects of vaccinations; is that correct?

A. No, that's not correct. I cannot say that. *It's so personal.*

You know, it's like one day I read an article about, yes, you should immunize; and then the next day I read an article about, no, you shouldn't immunize.

Ultimately, all I can go back to is if I believe in that we are divine in our design, immunizations are not necessary.

(Emphasis added). (Tr. at 53–56).

Also, Mrs. Caviezel is of the belief that immunizations are not necessary because of the divinity of the human body, namely, in her opinion, the body is a "perfect creation" and we don't need to inject vaccination into our bodies. However, she makes a distinction between taking medications because of a disease, and immunization which is putting disease into the body. As to medications, she concedes that she herself takes Motrin for headaches. She also gives Motrin to her children when they have a very high fever and cannot sleep at night, and gives them peppermint oil when they have an earache. She also partially conceded that these views are not a religious belief, but more of a medical or scientific belief.

Q. So that's not what, would you agree, that's not a religious belief, that's more a medical or scientific belief, correct?

MS. FINN: Objection.

THE COURT: Overruled.

A. Well, yes and no, because it's inside. You're adding something that doesn't belong there.

Q. Would you agree that a Motrin doesn't belong there?

A. A Motrin doesn't belong there either. I agree.

(Tr. at 59).

Mrs. Caviezel was questioned at length about the letter her attorney wrote on October 29, 2007 (Defendants Ex. B), which was submitted to the school district when she tried to register her child on October 17, 2009. She believed that based on this letter she would be granted a religious exemption. She wrote portions of this letter regarding her religious beliefs. She is more religious than her husband. Mrs. Caviezel stated that she has "deeply rooted" religious beliefs but these beliefs did not prevent her from having her three other children vaccinated. In the letter she wrote that her religious beliefs are "deeply rooted in spirituality and in our cultural beliefs." However, she agreed that "cultural beliefs" don't have anything to do with religion. Also, she agreed that her statement in the letter about "honor, love and respect" and "mother earth" are not, strictly speaking, religious concepts. Mrs. Caviezel also conceded that the important words "our sincere and genuine religious beliefs," was a term that her attorney suggested she use.

Further, in the letter written by her attorney and also signed by Mrs. Caviezel and her husband, it stated "for thousands of years our ancestors never injected diseases into their bodies; nor do we want to now inject diseases or make unnecessary marks on our bodies." (Defendants Ex. B). She wrote that sentence and was referring to scars from vaccinations. However, Mrs. Caviezel conceded that her pierced ears for earrings would also be an "unnecessary mark." In addition, her 6½ year old daughter also has pierced ears; done when she was three months old. She agreed that was also an "unnecessary mark." However, she stated that these unnecessary marks were not against her religion and were for beautification and traditional reasons.

Andreas Schenk Caviezel, the husband of Martina Caviezel and co-plaintiff in this case, started his testimony by stating, "my religious beliefs are really personal...." (Tr. at 97). He stated that there is something bigger watching over us and there is destiny and basically, it doesn't require that we vaccinate. His testimony was brief. He stated his religious beliefs were very personal, and could be summarized as follows:

Q. And how are your beliefs sincere and genuine making you eligible for the exemption?

A. Well, they are my own beliefs.

And, frankly, I'm not sure how anybody could question my own beliefs or how somebody could question anybody else's own beliefs.

Q. How sincere are these beliefs?

A. These are beliefs that I live by, that I operate under, so they're the only beliefs I have.

(Tr. at 100).

Nor does Mr. Schenk Caviezel attend any services at the Sanctuary of the Be-loved church. Moreover, his claim for religious exemption is not based on beliefs from the Sanctuary of the Beloved Church or by any other church.

## B. The Defendants' Case

Dr. Thomas Dolan is the Superintendent of the Great Neck Union Free School District. In late October 2009, Principal Shalom called him with regard to the written request for exemption from vaccination from the Caviezel family. He reminded Ms. Shalom of the District's procedures which follow New York State Education guidelines and he asked her, as principal, to make the preliminary determination as to whether a waiver will be granted. After the principal made a written determination denying the waiver, he asked for copies of all the documents and memos. After reviewing the records, including the letter from Patricia Finn, Esq., signed by the Caviezels, he asked his secretary to call the plaintiffs and ask if they would be interested in having a meeting with him. His secretary spoke to Mrs. Caviezel on December 1, 2009. She said she will speak to her attorney and get back to us. They never heard back from her until after this action was commenced. As to the plaintiffs' religious exemption request, he had no opinion. This denial was made solely by Principal Shalom. If he had the opportunity to question the plaintiffs and, if he believed that their religious belief was sincere, he would have granted the exemption.

Both sides rested.

## III. DISCUSSION

Before delving into the main legal issues in this case, involving whether the plaintiffs have established "genuine and sincere

religious beliefs," the Court will address two preliminary issues raised by the defendants.

### A. The Notice of Claim Issue

With respect to the notice of claim issue, New York Education law § 3813 requires any plaintiff bringing a claim against a school district or its officers to file a notice of claim within three months of the accrual of the plaintiff's claim. Specifically Section 3813 states in pertinent part:

1. No action or special proceeding, for any cause whatever, except as hereinafter provided ... involving the rights or interests of any district or any such school shall be prosecuted or maintained against any school district [or] board of education, ... or any officer of a school district [or] board of education ... unless it shall appear by and as an allegation in the complaint or necessary moving papers that a written verified claim upon which such action or special proceeding is founded was presented to the governing body of said district or school within three months after the accrual of such claim, and that the officer or body having the power to adjust or pay said claim has neglected or refused to make an adjustment or payment thereof for thirty days after such presentment ...

The defendants contend that the likelihood of success on the merits of the plaintiffs state law causes of action is minimal, because the plaintiffs failed to serve a notice of claim on the school district. The plaintiffs assert that this section does not bar the present state lawsuit because they seek equitable relief rather than monetary damages. Unfortunately, apparently, New York state courts have not definitively stated whether an exception to Section 3813 exists for claims seeking only equitable relief. The most recent New York Court of Appeals case on the issue, *Cayuga–Onondaga Counties Bd. of Co-op. Educational Services v. Sweeney*, 89 N.Y.2d 395, 400, 676 N.E.2d 854, 654 N.Y.S.2d 92 (1996), appears to suggest that an exception is made to this requirement only for cases brought to vindicate a public interest rather than a private right. *See, also, Board of Educ. Of Union–Endicott Cent. School Dist. v. New York State Public Employment*, 197 A.D.2d 276, 611 N.Y.S.2d 672 (3rd Dep't 1994). However, other courts have held that a separate exception applies for claims seeking only equitable relief. *See Kahn v. Department of Educ. of City of New York*, 26 Misc.3d 366, 370–71, 887 N.Y.S.2d 435 (N.Y.Sup. 2009). Moreover, the Court of Appeals has cited approvingly to a Second Department case holding that there is the equitable relief exception. *Ruocco v. Doyle*, 38 A.D.2d 132, 327 N.Y.S.2d 933 (2d Dep't 1972) (cited by *Union Free School Dist. No. 6 v. New York State Human Rights Appeal Bd.*, 35 N.Y.2d 371, 362 N.Y.S.2d 139, 320 N.E.2d 859 (1974)).

Here, the plaintiffs' state law claim does not seek to vindicate a public interest, but rather seeks to have the Court recognize their personal objection to immunization based on a genuine and sincere religious belief. However, the plaintiffs seek only equitable relief, and are therefore arguably exempt from the notice of claim requirement on that ground. Ultimately, the Court has determined that, even if the plaintiffs are exempt from the notice of claim requirement, they are not entitled to a preliminary injunction for other reasons. Given the apparent unsettled nature of the law in New York state courts, the Court need not rule definitely on this notice of claim issue.

### B. The Exhaustion Issue

With regard to the plaintiffs' exhaustion of their administrative remedies,

it is the general rule in New York state courts that individuals challenging an administrative determination must exhaust their administrative remedies before pursuing relief in a court of law. *See, e.g., Mirenberg v. Lynbrook Union Free School Dist. Bd. of Educ.,* 63 A.D.3d 943, 943–44, 881 N.Y.S.2d 159 (2d Dep't 2009). This requirement applies to state claims brought in federal court. *See, e.g., Henneberger v. County of Nassau,* 465 F.Supp.2d 176, 197 (E.D.N.Y.2006) (holding that state procedural law applies to state claims brought in federal court) (citing *Felder v. Casey,* 487 U.S. 131, 141, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988)).

In the immediate context, both New York's Public Health Law and its Education Law provide that a party who is denied a religious exemption from school immunization may appeal that decision to the New York State Commissioner of Education. Specifically, Public Health Law Section 2164(7) provides in part:

> (b) A parent, a guardian or any other person in parental relationship to a child denied school entrance or attendance may appeal by petition to the commissioner of education in accordance with the provisions of section three hundred ten of the education law.

Section 310 of the New York Education law provides:

> Any party conceiving himself aggrieved may appeal by petition to the commissioner of education who is hereby authorized and required to examine and decide the same; and the commissioner of education may also institute such proceedings as are authorized under this article. The petition may be made in consequence of any action ... [b]y a principal, teacher, owner or other person in charge of any school in denying a child admission to, or continued attendance at, such school for lack of proof of

required immunizations in accordance with section twenty-one hundred sixty-four of the public health law.

The parties here agree that the plaintiffs did not appeal the denial of their exemption to the New York State Commissioner of Education. Thus, they have not exhausted their administrative remedies. The plaintiffs have primarily argued that they are exempt from the exhaustion requirement because they also assert federal constitutional claims. While a failure to exhaust state administrative remedies does not generally bar federal civil rights claims, the Court is aware of no authority providing that this state law claim may be pursued in federal court in violation of state procedural law.

Nevertheless, the Court declines to weigh this issue heavily in its present analysis. Any dismissal stemming from this failure by the plaintiffs would be without prejudice to refile. If the plaintiffs then exhausted their administrative remedies and had their application again rejected, the parties would be in the same position they are in today. Any decision by the Commissioner of Education is subject to the ultimate decision of the federal court. Thus, the exhaustion of administrative remedies need not be a determinative issue in the preliminary injunction analysis.

## C. *The Standards—Preliminary Injunction*

The plaintiffs seek a preliminary injunction requiring the Great Neck School District to register the subject child, CC, for pre-kindergarten classes scheduled to begin in September 2010 without being required to be vaccinated. The defendants oppose this relief.

In the Second Circuit, a plaintiff seeking a preliminary injunction must generally show:

(1) irreparable harm in the absence of the injunction and

(2) either

 (a) a likelihood of success on the merits or

 (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.

*County of Nassau, N.Y. v. Leavitt,* 524 F.3d 408, 414 (2d Cir.2008) (internal quotations and citations omitted, formatting not in original). However, when a party "seeks a preliminary injunction that will affect 'government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard [under (2)(a), above].'" *Wright v. Giuliani,* 230 F.3d 543, 547 (2d Cir.2000) (quoting *Beal v. Stern,* 184 F.3d 117, 122 (2d Cir.1999)). In addition, when the injunction sought "will alter rather than maintain the status quo," a plaintiff must make an additional showing that the likelihood of success is "'clear' or 'substantial.'" *Id.* (quoting *Rodriguez v. DeBuono,* 175 F.3d 227, 233 (2d Cir.1999)).

Here, the preliminary injunction the plaintiffs seek will "affect government action taken in the public interest pursuant to a statutory or regulatory scheme," and will also alter the status quo. *Id.* The plaintiffs therefore must show that (1) they face irreparable harm if the injunction does not issue, and (2) there is a clear or substantial likelihood that they will succeed on the merits of their case.

### 1. *As to Irreparable Harm*

■ The first prong of the test for a preliminary injunction is whether the plaintiffs will suffer irreparable harm if no injunction issues. The parties agree that the subject child CC will not begin school until September 2010, but disagree as to whether there is any cognizable harm prior to that time. While the Court doubts there can be any cognizable harm to the plaintiffs prior to September 2010, it is satisfied that there would be irreparable harm to this child entering school after that time, and that this is sufficiently near to the present time to satisfy this prong of the test.

### 2. *As to Whether the Plaintiffs have a Substantial Likelihood of Success*

The heart of the present preliminary injunction analysis is whether the plaintiffs have a substantial likelihood of success on the merits of their claims. The plaintiffs assert both a state law claim and federal constitutional claims in support of the immunization waiver they seek. The plaintiffs contend both that the New York Public Health law entitles them to an exemption from the immunization requirement, and that the First Amendment also guarantees their right to be exempt from inoculation requirements. The plaintiffs further assert that their Sixth Amendment right to access to counsel was abridged by the defendants' actions, and that this also entitles them to the exemption. The Court considers each of these in turn.

### D. *Plaintiffs' State Law Claims*

The plaintiffs assert that their genuine and sincere religious beliefs entitle them to an exemption under New York Public Health Law § 2164(9) from New York's requirement that children be immunized before attending school. The defendants deny that the plaintiffs' objections are based on religion and are genuine and sincere, and therefore oppose this relief. The defendants also contend that the plaintiffs' present action is precluded by

their failure to file a notice of claim and exhaust administrative remedies.

Section 2164(7) of the New York Public Health Law requires students to receive immunizations for several communicable diseases prior to attending public school. It states in pertinent part:

7. (a) No principal, teacher, owner or person in charge of a school shall permit any child to be admitted to such school, or to attend such school, in excess of fourteen days, without the certificate provided for in subdivision five of this section or some other acceptable evidence of the child's immunization against poliomyelitis, mumps, measles, diphtheria, rubella, varicella, hepatitis B, pertussis, tetanus, and, where applicable, Haemophilus influenzae type b(Hib) and pneumococcal disease; provided, however, such fourteen day period may be extended to not more than thirty days for an individual student by the appropriate principal, teacher, owner or other person in charge where such student is transferring from out-of-state or from another country and can show a good faith effort to get the necessary certification or other evidence of immunization.

Section 2164(7). As initially stated, Section 2164(9) provides an exception to this requirement for students whose parents object to these vaccinations on religious grounds. It reads:

9. [Section 2164] shall not apply to children whose parent, parents, or guardian hold genuine and sincere religious beliefs which are contrary to the practices herein required, and no certificate shall be required as a prerequisite to such children being admitted or received into school or attending school.

Section 2164(9). In light of this statute, courts applying this law have focused on whether a plaintiffs' opposition to immunization is based on beliefs that are (1) religious, (2) genuine and (3) sincere.

Here, the plaintiffs assert that their genuine and sincere religious beliefs prohibit them from submitting to the vaccination of their child, CC, and that they are thus entitled to the exemption provided for by Section 2164(9).

### E. Did the Plaintiffs Establish a "Genuine and Sincere Religious Belief?"

The Court therefore will address the merits of the plaintiffs' underlying state law claim, and, as noted above, does so with reference to three well-settled elements. The first and most difficult of these elements is whether a person's objection to immunizations is "religious." Though a definition of religion is eminently elusive and constitutionally perilous, the United States Supreme Court the Second Circuit and the State Courts have provided guidance on this issue. In general, however, this guidance describes what is not religious; not what is a genuine and sincere religious belief.

For example, the Second Circuit has indicated that "philosophical and personal" belief systems are not "religious" belief, in spite of the fact that these belief systems may be held with "strong conviction" and inform critical life choices. *Mason v. General Brown Cent. School Dist.*, 851 F.2d 47, 52 (2d Cir.1988). On the other hand, a person need not be a member of a formal religious sect or church to have "religious" beliefs. *See Sherr v. Northport–East Northport Union Free School Dist.*, 672 F.Supp. 81, 91 (E.D.N.Y. 1987). In fact, a person's religious beliefs need not come from a traditional "God", but rather may follow from a belief in something that "occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God." *U.S. v. Seeger*,

380 U.S. 163, 166 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); *Mason*, 851 F.2d at 51. Ultimately, the Second Circuit's most explicitly expressed opinion on the definition of religion is that courts must tread lightly when undertaking the task. This wise observation was clearly stated in *Friedman v. Clarkstown Cent. School Dist.*, 75 Fed. Appx. 815, 818 (2d Cir.2003):

> "This Circuit repeatedly has emphasized "the limited function of the judiciary in determining whether beliefs are to be accorded first amendment protection." *Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir.1984); *accord id.* ("It cannot be gainsaid that the judiciary is singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs. Mindful of this profound limitation, our competence properly extends to determining 'whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious.'" (quoting *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965))); (quoting *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir.1996)). "While it is a delicate task to evaluate religious *sincerity* without questioning religious *verity*, our free exercise doctrine is based upon the premise that courts are capable of distinguishing between these two questions." *Jolly*, 76 F.3d at 476."

The second and third touchstones the Court applies here are whether the plaintiffs' religious beliefs contrary to vaccination are "genuine" and "sincere." Generally, the analyses of these two factors merge, and a Court is called to determine whether an expressed religious belief contrary to vaccination is in fact held by a child's parents, and is the real reason that the parents object to vaccination. *See id.; Sherr*, 672 F.Supp. at 94.

## F.   *The Law on "Religious Beliefs"*

 Religious freedom in the United States, accorded to us by the First Amendment, is not an absolute right. The Supreme Court has held that, generally the right of parents to raise their children in accord with their personal and religious beliefs must yield when the health of children is at risk or when there is a recognized threat to public safety. *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

 Also, as stated in *Mason v. General Brown Central School District*, 851 F.2d 47 (2d Cir.1988), an individual's assertion that the belief she holds is "religious", is not sufficient. "A threshold inquiry into the 'religious' aspect of particular beliefs cannot be avoided," in order for the Court to determine which is in fact based on religious beliefs and what is based on secular or philosophical principles.

 One of the most explanatory and oft cited decisions in this field is *Sherr v. Northport–East*, 672 F.Supp. 81 (E.D.N.Y.1987). In *Sherr* it was explained that, "it has been settled law for many years that claims of religious freedom must give way in the face of the compelling interest of society in fighting the spread of contagious diseases through mandatory inoculation programs." *Id.* at 88. Into this equation, the New York Legislature has inserted the provision of § 2164(9). However, as stated in *Sherr*, society's compelling interest in preventing disease must override any personal opposition to immunization that some persons may possess. Therefore, the statutory exception must be restricted to persons whose opposition to immunization stems from "religious" belief; not views founded upon medical, personal, philosophical or even moral considerations. *See Farina v. Board of Education of the City of New York*, 116 F.Supp.2d 503 (E.D.N.Y.2000).

█ Both the Supreme Court and the Second Circuit have stated that "religion", in this context, must involve the "ultimate concerns" of individuals. *United States v. Seeger*, 380 U.S. at 187, 85 S.Ct. at 865; *International Society For Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 440–41 (2d Cir.1981). In an important statement, which is relevant in this case, the Second Circuit stated that "a touchstone of a religion is the believer's categorical 'disregard of elementary self-interest in preferences to transgressing the religious tenets.'" *United States v. Allen*, 760 F.2d 447, 451 (2d Cir.1985).

The Second Circuit has also indicated that "philosophical and personal" belief systems are not religion, in spite of the fact that these belief systems may be held with "strong conviction" and inform critical life choices. *Mason v. General Brown Cent. School Dist.*, 851 F.2d 47, 52 (2d Cir.1988). On the other hand, as stated above, a person need not be a member of a formal religious sect or church to have "religious" beliefs. *See Sherr v. Northport–East Northport Union Free School Dist.*, 672 F.Supp. at 91. In fact, a person's religious beliefs need not come from a traditional "God", but rather may follow from a belief in something that "occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God." *U.S. v. Seeger*, 380 U.S. 163, 166, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); *Mason*, 851 F.2d at 51.

### G. *The Findings*

█ The Court finds that the Caviezels sincerely and genuinely oppose vaccinations for their fourth child, but the plaintiffs failed to prove that these objections are "religious" in nature. The Court finds that the plaintiffs failed to prove that they held "genuine and sincere religious beliefs" contrary to the practice of vaccination of students entering school. The Court does not doubt that the plaintiff Martina Caviezel has genuine and sincere beliefs, but they are not religious beliefs. Although they need not be a member of an organized religion, Mrs. Caviezel is a member of the Sanctuary of the Beloved Church. There is no evidence that this church in any way expresses opposition to vaccinations. In fact, Mr. Caviezel testified that her church is not opposed to vaccinations.

The Court finds that one of the reasons Mrs. Caviezel objects to vaccinations is because it may not be safe. She testified that it may be harmful and may cause autism. Her concern in that regard is real, and understandable, but it is not based on a religious belief. Even though she feels that the body is divine and therefore does not need medications, she conceded that, on occasion she takes Motrin and essential oils, indicating a selective personal belief—not a religious belief.

Even a review of her attorney's letter, drafted with Mrs. Caviezel's assistance reveals the non-religious reasons advanced by the plaintiffs. She stated that their religious belief are, in part, deeply rooted in their cultural beliefs. They love, honor and respect "our Creator and Mother Earth"; and "our bodies." They go on to say that respect for their past keeps their spirituality and culture alive. Again a mixed message. However, it is revealing that their letter states: "For thousands of years our ancestors never injected diseases into their bodies, nor do we want to now inject diseases or make unnecessary marks on our bodies." There is nothing religious about this statement. It indicates two facts: (1) a possible fear of injecting a disease in their body by way of vaccination, and (2) a reluctance to have unnecessary marks on their bodies. These are personal rather than religious fears. We know that Martina Caviezel did make

an unnecessary mark on her body by having pierced ears. Also, she pierced the ears of her youngest daughter when she was three months old. In her attorney's letter prepared after consultation with the plaintiffs, some of the words used were "cultural belief", "honor, love and respect" and "Mother Earth." These are certainly understandable traits, but not really religious manifestations.

There is another simple non-religious explanation for the plaintiffs' reluctance to have their daughter vaccinated. She stated the reason herself. Permit me to repeat it: she believes that vaccinations may not be safe. She read articles relating to the harmful effects of vaccinations, including the fear of autism. This is surely a rational fear, but it is not of a religious nature.

Also, the fact that she had her first three children vaccinated is evidence of no religious problem on those occasions. Of course, Mrs. Caviezel says she changed and developed those "feelings" after the vaccinations of her three other children. However, the Court finds that those feelings are not "religious" in nature.

Finally, using her own words, the Court finds that her reluctance to have her daughter vaccinated does not arise from a religious belief, but from a personal, moral or cultural feeling against vaccination for her young child. These views and feelings are more in the nature of a secular philosophy rather than a religious belief. Mrs. Caviezel said it herself. She knows that she doesn't believe it is safe. She also said, "It's so personal," and, that she believes, "It's not necessary."

## IV. CONCLUSIONS

The Court finds that the plaintiffs have not shown that they hold genuine and sincere religious beliefs which prohibit vaccinations. Accordingly, the plaintiffs' mo-

tion for a preliminary injunction is denied in all respects.

The parties are directed to contact United States Magistrate Judge William D. Wall to schedule discovery.

**SO ORDERED.**